**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

```
-------------------------------------------------------------------- x
                                                    :
HANESBRANDS INC. and HBI BRANDED                    :
APPAREL ENTERPRISES, LLC,                           :
                                                    :
                                                    :  Civil Action No. 08-cv-0545 (VM)
                         Plaintiffs,                :
                                                    :
          - against -                               :
                                                    :
METRO SPORTS (d/b/a PLAYERS SPORTS, d/b/a           :
HOT DOT, d/b/a HIP HOP SPORTSWEAR); HOT             :
DOT FASHION, INC.; HIP HOP SPORTSWEAR               :
INC.;   MICHAEL   FASHIONS   INC.   (d/b/a          :
MICHAEL   FASHION);   LONDON   BOY                  :
SPORTSWEAR,  LTD.  (d/b/a  LONDON  BOY);            :
TRANDZ N.Y., CORP. (d/b/a OCTANE); OCTANE           :
NYC INC. (d/b/a OCTANE); FLASH SPORTS,              :
INC.;  104TH  ST.  FASHION  INC.  (d/b/a  104       :
STREET FASHIONS, d/b/a 104 FASHIONS); F.T.C.        :
FASHION; various JOHN and JANE DOES, and            :
XYZ COMPANIES (UNIDENTIFIED),                       :
                                                    :
                         Defendants.                :
                                                    :
-------------------------------------------------------------------- x
```

## MEMORANDUM IN SUPPORT OF PLAINTIFFS' MOTION FOR A TEMPORARY RESTRAINING ORDER, SEIZURE ORDER, AND ORDER TO SHOW CAUSE WHY A PRELIMINARY INJUNCTION SHOULD NOT ISSUE

# <u>TABLE OF CONTENTS</u>

I.   PRELIMINARY STATEMENT ........................................................................... 1

II.  STATEMENT OF FACTS ................................................................................. 2
     A.   Plaintiffs' Valuable Trademarks Are Entitled To Protection ................. 2
     B.   Plaintiffs' Investigation of Defendants' Counterfeiting Activities. ........ 3
     C.   Defendants' Conduct Warrants A Temporary Restraining Order,
          Preliminary Injunction, and Seizure of Counterfeit Products ............... 7

III. ARGUMENT .................................................................................................. 8
     A.   Plaintiffs Have Met The Standard for Interlocutory Relief. .................. 8
     B.   Plaintiffs Are Likely To Succeed On Their Trademark Claims. .......... 10
          1.   Counterfeit Goods Create A Likelihood of Confusion Under the
               Lanham Act .......................................................................... 10
          2.   Copying Results In A Presumption Of Likelihood Of Confusion. .......... 13
     C.   Plaintiffs Will Suffer Irreparable Harm In The Absence Of A Temporary
          Restraining Order and Preliminary Injunction. ................................. 13
     D.   The Balance Of Hardships Tips In Plaintiffs' Favor. ......................... 15
     E.   Plaintiffs Also Satisfy The Alternate Standards For A Preliminary
          Injunction. ........................................................................................ 16
     F.   Plaintiffs Have Met The Standards For An Seizure Order ................. 16
          1.   A Seizure Order Is the Only Relief That Will Adequately Protect
               Plaintiffs' Trademark Rights ................................................. 18
          2.   Equitable Considerations Support A Seizure Order. ................. 19
          3.   Plaintiffs Have Satisfied the Procedural Requirements Set Forth In
               Sections 1116(d)(2) & (d)(4)(b). ............................................ 20

IV.  CONCLUSION .............................................................................................. 21

# <u>TABLE OF AUTHORITIES</u>

## <u>Cases</u>

*Blue Bell, Inc. v. Maverick Sportswear, Inc.*, 184 U.S.P.Q. 77, 79-80 (S.D.N.Y. 1974)..............16

*Chambers v. Time Warner, Inc.*, 282 F.3d 147, 155 (2d Cir. 2002)............................................10

*Colgate-Palmolive Co. v. North Am. Chem. Corp.*, 238 F. Supp. 81, 87 (S.D.N.Y. 1964)..........16

*Fun-Damental Too, Ltd. v. Gemmy Indus. Corp.*, 111 F.3d 993, 997-98 (2d Cir. 1997) .........9, 12

*Grand Jewels, Inc. v. Montres Rolex*, 104 S. Ct. 1594 (1984) .....................................................7

*GTFM, Inc. v. Solid Clothing, Inc.*, 215 F. Supp. 2d 273, 297 (S.D.N.Y. 2002) .........................13

*Gucci Am., Inc. v. Duty Free Apparel Ltd.*, 286 F. Supp. 2d 284, 287 (S.D.N.Y. 2003) .............10

*Hasbro, Inc. v. Lanard Toys, Ltd.*, 858 F. 2d 70, 73 (2d Cir. 1988) .............................................13

*Helene Curtis Industries, Inc. v. Church & Dwight Co.*, 560 F.2d 1325, 1332-33 (7th Cir. 1977), *cert. denied*, 434 U.S. 1070 (1978).......................................................................19

*In re Vuitton et Fils S.A.*, 606 F.2d 1, 5 (2d Cir. 1979).......................................................passim

*Int'l Longshoremen's Ass'n v. New York Shipping Ass'n, Inc.*, 965 F.2d 1224, 1228 (2d Cir. 1992) ...............................................................................................................................9

*Kraft Gen. Foods, Inc. v. Allied Old English, Inc.*, 831 F. Supp. 123, 132 (S.D.N.Y. 1993) .......13

*Le Sportsac, Inc. v. K Mart Corp.*, 754 F.2d 71, 74 (2d Cir. 1985)..............................................16

*Malletier v. Burlington Coat Factory Warehouse, Corp.*, 426 F.3d 532, 538 (2d Cir. 2005) ...............................................................................................................................12, 14

*Microsoft Corp. v. CMOS Techs., Inc.*, 872 F. Supp. 1329, 1335 (D.N.J. 1994) ........................12

*Mobil Oil Corp. v. Pegasus Petroleum Corp.*, 818 F.2d 254, 258 (2d Cir. 1987) .......................13

*Montres Rolex, S.A. v. Snyder*, 718 F.2d 524, 528 (2d Cir. 1983)................................................7

*Multi-Local Media Corp. v. 800 Yellow Book, Inc.*, 813 F. Supp. 199, 202 (E.D.N.Y. 1993) ...............................................................................................................................14

*My-T-Fine Corp. v. Samuels*, 69 F.2d 76, 78 (2d Cir. 1934) ......................................................16

*New York Soc'y of Certified Public Accountants v. Eric Louis Assocs., Inc.*, 79 F. Supp. 2d 331, 340 (S.D.N.Y. 1999) .................................................................................................13

*Omega Importing v. Petri-Kine Camera Co.*, 451 F.2d 1190, 1195 (2d Cir. 1971)....................19

*Paco Rabanne Parfums, S.A. v. Norco Enters., Inc.*, 680 F.2d 891, 894 (2d Cir. 1982)..............14

*Paddington Corp. v. Attiki Importers & Distrib., Inc.*, 996 F.2d 577, 586-87 (2d Cir.1993) .......13

*Polaroid Corp. v. Polarad Elecs. Corp.*, 287 F.2d 492, 495 (2d Cir. 1961)...............................11

*Polymer Tech. Corp. v. Mimran*, 975 F.2d 58, 62 (2d Cir. 1992) ..............................................15

*Reuters Ltd. v. United Press Int'l*, 903 F.2d 904, 909 (2d Cir. 1990)....................................15, 16

*Safeway Stores, Inc. v. Safeway Properties, Inc.*, 307 F.2d 495, 500 (2d Cir. 1962) ................... 16

*Tactica Int'l, Inc. v. Atlantic Horizon Int'l, Inc.*, 154 F. Supp. 2d 586, 597 (S.D.N.Y. 2001) ............................................................................................................................................. 9

*Topps Co., Inc. v. Gerrit J. Verburg Co.*, No. 96-7302, 1996 WL 719381, at *6 (S.D.N.Y. Dec. 13, 1996) ............................................................................................................................ 12

*United States ex rel. Vuitton et Fils S.A. v. Karen Bags, Inc.*, 592 F. Supp. 734, 743 n.4 (S.D.N.Y. 1984) .......................................................................................................................... 18

*Virgin Enters., Ltd. v. Nawab*, 335 F.3d 141, 145 (2d Cir. 2003) ................................................ 9

*Yurman Design Inc. v. Diamonds & Time*, 169 F. Supp. 181, 184-86 (S.D.N.Y. 2001) ............... 9

## Statutes

15 U.S.C. § 1051 .......................................................................................................................... 1

15 U.S.C. § 1057(b) ................................................................................................................... 11

15 U.S.C. § 1065 ........................................................................................................................ 11

15 U.S.C. § 1114 ........................................................................................................................ 17

15 U.S.C. § 1114(1) ......................................................................................................... 1, 10, 11

15 U.S.C. § 1116(d) .................................................................................................................... 17

15 U.S.C. § 1116(d)(2) ............................................................................................................... 20

15 U.S.C. § 1116(d)(4) ............................................................................................................... 17

15 U.S.C. § 1116(d)(4)(B) .......................................................................................................... 20

15 U.S.C. § 1116(d)(4)(B)(ii) ..................................................................................................... 20

15 U.S.C. § 1116(d)(4)(B)(iii) .................................................................................................... 19

15 U.S.C. § 1116(d)(4)(B)(iv) ..................................................................................................... 19

15 U.S.C. § 1116(d)(4)(B)(v) ...................................................................................................... 20

15 U.S.C. § 1116(d)(4)(B)(vi) ..................................................................................................... 20

15 U.S.C. § 1125(a) .......................................................................................................... 1, 10, 11

15 U.S.C. § 1125(c) ...................................................................................................................... 1

18 U.S.C. § 1961(a) ...................................................................................................................... 8

## Other Authorities

130 Cong. Rec. H12080 (daily ed. Oct. 10, 1984) ..................................................................... 17

130 Cong. Rec. H12081 (daily ed. Oct. 10, 1984) ..................................................................... 20

*Intellectual Property Crimes*, 9. ALB. L.J. SCI. & TECH., 235, 298-306 (1999) ............................ 8

Stop Counterfeiting in Manufactured Goods Act, Pub. L. No. 109-181, 120 Stat. 285 ............... 15

Plaintiffs Hanesbrands Inc. ("Hanesbrands") and HBI Branded Apparel Enterprises, LLC ("HBI") (collectively "Plaintiffs") submit this memorandum of law in support of their motion for a temporary restraining order, seizure order, and an order to show cause why a preliminary injunction should not issue. Plaintiffs submit proposed orders herewith.

## I.    PRELIMINARY STATEMENT

This is an action for trademark infringement and counterfeiting for violation of the Lanham Act, 15 U.S.C. § 1051, *et seq.*, specifically Sections 32(1) and 43(a) thereof, 15 U.S.C. § 1114(1) and 15 U.S.C. § 1125(a), and other related causes of action under federal, state, and common law.[1]  Plaintiffs seek the above-mentioned relief against Metro Sports ("Metro Sports"); Hot Dot Fashion, Inc. ("Hot Dot"); Hip Hop Sportswear Inc. ("Hip Hop"); Michael Fashions Inc. (d/b/a Michael Fashion) ("Michael Fashion"); London Boy Sportswear Ltd. (d/b/a London Boy) ("London Boy"); Trandz N.Y., Corp. ("Trandz"); Octane NYC Inc. ("Octane"); Flash Sports, Inc. ("Flash Sports"); 104th St. Fashions; and F.T.C. Fashion  (collectively "Defendants"); along with unknown individuals and business entities whose identities will be determined through discovery.

Defendants have, without authorization or consent, misappropriated Plaintiffs' trademarks, some of which are famous around the world, for use in connection with counterfeit apparel ("Counterfeit Products").  Specifically, Defendants offer for sale and sell sweatshirts bearing Plaintiffs' trademarks.  Indeed, Defendants copy many of the details in Plaintiffs' authentic goods, including slavish copies of the trademarks found on Plaintiffs' authentic goods, thus making it difficult, although not impossible, to distinguish between authentic goods and Counterfeit Products.

---

[1] The Complaint also asserts claims under 15 U.S.C. § 1125(c), New York statutory law, and common law.  These are not the bases for the instant motion, which rests on Plaintiffs' claims under 15 U.S.C. §§ 1114(1) and 1125(a).

Defendants' conduct has been uniformly condemned by courts in this Circuit and others. Such conduct causes Plaintiffs irreparable harm and incalculable loss of goodwill and business reputation. In view of Defendants' conduct, Plaintiffs respectfully request that this Court issue (a) a temporary restraining order against Defendants enjoining their manufacturing, distributing, exporting, importing, shipping, advertising, offering for sale, selling, or facilitating the sale of Counterfeit Products; (b) a seizure order of Counterfeit Products and related records; (c) an order directing Defendants' to preserve all records related to the Counterfeit Products, and (d) an order to show cause why a preliminary injunction should not issue.

## II.    STATEMENT OF FACTS

### A.    Plaintiffs' Valuable Trademarks Are Entitled To Protection

Hanesbrands is a global consumer goods company with more than a century of history and a portfolio of leading apparel essentials, including T-shirts, bras, panties, men's underwear, kids' underwear, socks, hosiery, casualwear, and activewear – including sweatshirts. Some of its brands include Hanes®, Champion®, Playtex®, Bali®, L'eggs®, Just My Size®, Barely There®, and Wonderbra®. Heller 3, Ex. A.[2] A recent survey shows that Hanesbrands can be found in eight out of 10 American households, and they are sold in hundreds of stores, plus via the Web and catalogs. *Id.* at 4, Ex. A. The Champion® brand enjoys a rich heritage dating back to 1919 and prides itself as an originator and innovator of men's and women's sports apparel. *Id.* at 5, Ex. B. The Champion® brand has a reputation both in the United States and around the world for high-quality products sold under CHAMPION trademark and "C" logo (collectively

---

[2] Affidavits will be referred to by the surname of the affiant followed by the cited paragraph number and exhibit, if any, *e.g.*, "Heller 3, Ex. A" refers to the second paragraph of the affidavit of Richard Heller and Exhibit A attached thereto. Affidavits refer to Plaintiffs' previously submitted motion where certain *ex parte* relief was sought. Because the current motion depends upon the same facts, the same affidavits are being submitted in support of the current motion.

the "CHAMPION Marks"), examples of these trademarks at issue may be found in Plaintiffs'
Complaint. *See also* Heller 6-7, Ex. C.

Under its Champion® brand, Hanesbrands manufactures and sells sweatshirts under the
CHAMPION Marks and the SUPER HOOD trademark (collectively the "CHAMPION and
SUPER HOOD Marks"). *Id.* The CHAMPION Marks have been used in connection with
sweatshirts at least as early as the mid-1960's. Heller 8. Plaintiffs have used the SUPER HOOD
mark in connection with sweatshirts since as early as 2002. Heller 9. The CHAMPION and
SUPER HOOD Marks are owned by HBI and licensed to Hanesbrands. Heller 10. The
CHAMPION and SUPER HOOD Marks are registered with the United States Patent and
Trademark Office. Registration certificates are attached to the Wharton Affidavit as Exhibits A-
F. The registrations cover, in particular, sweatshirts, along with other goods.

### B.    Plaintiffs' Investigation of Defendants' Counterfeiting Activities.

Plaintiffs have recently discovered that Defendants offer for sale and sell sweatshirts that
bear Plaintiffs' CHAMPION and SUPER HOOD Marks. Martinez 3; Heller 11. Plaintiffs
commenced a diligent investigation to determine where Counterfeit Products were sold. The
investigation commenced with agents for Plaintiffs purchasing suspect goods at a variety of
locations. Martinez 5; Ortiz 5; and Melo 4. The investigators purchased Counterfeit Products
and conveyed all receipts and information about the name and location of the store to Mr.
Manuel Martinez, a marketing agent for Plaintiffs investigating Defendants' counterfeit
activities. *See* Martinez 6; Ortiz 6; and Melo 5. Mr. Martinez then conveyed the sweatshirts,
receipts, and reports from the investigators to attorneys for Plaintiffs, who, in turn, provided
them to Richard Heller, Senior Marketing Manager – Champion Athleticwear (a division of
Hanesbrands), for further review. Martinez 12, Wharton 6; Heller 13.

Plaintiffs' investigation shows that Defendants sell sweatshirts bearing replicas of Plaintiffs' CHAMPION and SUPER HOOD Marks. Heller 14. The Counterfeit Products differ from authentic goods in only the smallest details, making it difficult to distinguish Counterfeit Products from authentic goods. Martinez 13; Heller 15. Plaintiffs have examined the Counterfeit Products closely and discovered they differ from authentic goods in at least the following manner:

- "Made in Malaysia" – this appears on the neck tag of counterfeit sweatshirts but authentic Super Hood® sweatshirts are not made in Malaysia, they are manufactured in Cambodia;

- Formatting of neck tag – on counterfeits, the formatting of the printing on the tag, including size, attribute, and plant code is poorly printed with letters and numbers inconsistent in spacing or printed unevenly;

- Neck tape printing – on counterfeits, the CHAMPION script printed on the neck tape is lighter than on authentic goods;

- Hood construction – although the counterfeits have two-ply hoods, the hood seam on the counterfeits is closed on the outer edge, versus on the interior of the hood on the authentic products;

- Draw cord tipping – the plastic tipping on the ends of hood draw cords are invented on the counterfeit sweatshirts;

- Color shade – the navy, brown, and green counterfeits are a lighter shade than genuine sweatshirts;

- Color description – genuine color descriptions are DARK BROWN, not BROWN; SEAWEED or CAMO, not GREEN; SCARLET, not RED; and URBAN GOLD, not

WHEAT.  The color description NAVY appears on the counterfeits as well as genuine sweatshirts.

- Muff pocket stitching – the "muff" or "kangaroo" pockets on the front counterfeit sweatshirts are sewn to the sweatshirt body directly on the edge of the pocket fabric whereas on authentic goods the stitching is set in approximately ⅛″ from the edge of the muff pocket fabric.

*See* Heller 16-17 (discussing differences found in each of 10 sweatshirts purchased from Defendants), Exhibits D-O attached thereto; Martinez 14.  As shown in the photographs below, the Counterfeit Products are very similar to authentic goods in overall appearance:

 

The investigation revealed that the Counterfeit Products are of inferior quality and sold for less than authentic goods.  Heller 19, 20.  The investigation also confirmed that Plaintiffs did not manufacture, inspect, package, or authorize Defendants or anyone else to manufacture, distribute, offer for sale, and sell the Counterfeit Products.  Heller 21.

The overall visual impact of Defendants' Counterfeit Products is not only confusingly similar to authentic goods, the Counterfeit Products bear Plaintiffs' federally registered

CHAMPION and SUPER HOOD Marks.  *Compare* Heller, Ex. D (counterfeit) with Ex. E (authentic).  In addition, the Counterfeit Product bears other indicia such as labels and hangtags that are virtually indistinguishable from the authentic products.  *Id.*

Plaintiffs' investigation reveals that Defendants sell Counterfeit Products at the following locations (with the name appearing on the store at the time of purchase of Counterfeit Products in parentheses and the defendant(s) associated with the address in brackets if not otherwise evident):

1.    3542 Broadway, Manhattan, New York 10031 (Hot Dot) [Hot Dot, Hip Hop, Metro Sports];

2.    3663 Broadway, Manhattan, New York 10031 (F.T.C. Fashion) [F.T.C. Fashion];

3.    565 West 145th Street, Manhattan, New York 10031 (No signage) [Hot Dot, Hip Hop, Metro Sports];

4.    2946 Third Avenue, Bronx, New York 10455 ("Sportswear") [Hot Dot, Hip Hop, Metro Sports];

5.    2936 Third Avenue, Bronx, New York 10455 (Michael Fashion);

6.    2908 Third Avenue, Bronx, New York 10455 (London Boy) ;

7.    560 Melrose Avenue, Bronx, New York 10455 (Octane) [Octane and Trandz];

8.    16 West 125th Street, Manhattan, New York 10027 (Flash Sports);

9.    118 West 125th Street, Manhattan, New York (Metro Sportswear) [Hot Dot, Hip Hop, Metro Sports];[3]

10.    1887 Third Avenue, Manhattan, New York 10029 (104 Street Fashions).

---

[3] Additional investigations by Plaintiffs' agents show the store at this address is no longer selling Counterfeit Products.  Plaintiffs do not seek a seizure of goods at this location, but bring this action against the entity responsible for selling counterfeit goods at this location.  *See* Martinez 11.

*See* Martinez 6-11, 17, Exhibits A-J.  Plaintiffs seek the seizure of all Counterfeit Products at these locations, except at 118 West 125th Street,[4] regardless of signage, along with related business records.

Plaintiffs' investigation also reveals a likely connection between Metro Sports, Hot Dot, and Hip Hop and a connection between Octane and Trandz.  The receipt from the store located at 3542 Broadway lists "Players Sports" and "Metro Sports" as the store name although the name on the outside of the store reads "Hot Dot."  Martinez 7, Ex. A.  A business card obtained from "Hot Dot" lists "Jay" as "President" of "Hot Dot  Sportswear" with an address of 3542 Broadway.  *Id* at 8, Ex. A.  The "Metro Sports" store is located around the corner from "Hot Dot" on West 145th Street.  *Id* at 9.  Likewise, business cards obtained from "Metro Sports" at 2946 Third Avenue, Bronx, New York 10455 and 118 West 125th Street, Manhattan, New York 10027 list "Hip Hop Sportswear d/b/a Metro" with an addresses matching the street addresses of the "Metro Sports" stores at which they were obtained.  *Id.* at 10, 11, Ex. C, H.[5]  Similarly, a receipt from "Octane" at 560 Melrose Avenue, Bronx, New York 10455 lists "Trandz NY Corp." at 560 Melrose Avenue, Bronx, New York 10455.  *Id.* at 6, Ex. F.

## C.    Defendants' Conduct Warrants A Temporary Restraining Order, Preliminary Injunction, and Seizure of Counterfeit Products.

The insidious effects of counterfeit goods have long been recognized by the courts.  *See, e.g., Montres Rolex, S.A. v. Snyder*, 718 F.2d 524, 528 (2d Cir. 1983), *cert. denied sub nom., Grand Jewels, Inc. v. Montres Rolex*, 104 S. Ct. 1594 (1984) (noting that counterfeiting had reached "epic proportions" and affirming seizure of counterfeits).  In 2004, New York City's Comptroller reported that approximately $23 billion was spent on counterfeit goods in New York City alone.  WILLIAM C. THOMPSON, BOOTLEG BILLIONS:  THE IMPACT ON THE COUNTERFEIT

---

[4] *See* n.3, *supra*.
[5] Metro Sports is not connected with Metro Sports, Inc., an authorized retailer of Champion® apparel.

GOODS      TRADE      ON      NEW      YORK      CITY      (2004),      *available*      *at*

http://www.comptroller.nyc.gov/bureaus/bud/04reports/Bootleg-Billions.pdf.    Counterfeits sales

cost the city approximately $1.6 billion in tax revenue.  *Id.*  In addition, Congress has recognized

the increasing link between organized crime and counterfeit goods.  *See* 18 U.S.C. § 1961(a)

(defining "racketeering" as including trafficking in counterfeit goods); *Intellectual Property*

*Crimes*, 9. ALB. L.J. SCI. & TECH., 235, 298-306 (1999) (discussing the RICO statute and its

relations to cases involving patterns of intellectual property theft).

     Without immediate relief, Defendants' counterfeiting will mislead the consuming public

and trade into purchasing counterfeit goods and will continue to irreparably damage Plaintiffs.

Because the counterfeits closely resemble authentic goods, an unknown number of consumers

will unknowingly purchase lower quality counterfeit goods.  Plaintiffs stand to lose sales and

control of their reputation and goodwill among the consuming public and trade.  In addition to

halting the distribution and sale of Counterfeit Products, it is crucial that Plaintiffs seize the

Counterfeit Products within the custody or control of Defendants and records showing the source

of the Counterfeit Products.  In addition, it is equally important that Defendants preserve all such

records and that Plaintiffs have expedited discovery regarding such records.  In addition,

Plaintiffs seek an order requiring Defendants to show why a preliminary injunction should not

issue during the pendency of this matter.

## III.   <u>ARGUMENT</u>

### A.   <u>Plaintiffs Have Met The Standard for Interlocutory Relief.</u>

     Plaintiffs are entitled to either a temporary restraining order or a preliminary injunction

upon a showing of (1) a probability of irreparable harm in the absence of injunctive relief, and

(2) either (a) a likelihood that it will succeed on the merits of its claim, or (b) a serious question

going to the merits and a balance of hardships tipping decidedly in its favor. *Virgin Enters., Ltd. v. Nawab*, 335 F.3d 141, 145 (2d Cir. 2003) (reversing denial of preliminary injunction).[6]

A plaintiff "need not show that success is certain, only that the probability of prevailing is 'better than fifty-percent.'" *Tactica Int'l, Inc. v. Atlantic Horizon Int'l, Inc.*, 154 F. Supp. 2d 586, 597 (S.D.N.Y. 2001) (citations omitted) (preliminary injunction against use of plaintiff's marks). Courts do not hesitate to grant provisional relief when distinctive intellectual property, such as Plaintiffs' CHAMPION and SUPER HOOD Marks, have been studiously copied. *See, e.g., Yurman Design Inc. v. Diamonds & Time*, 169 F. Supp. 181, 184-86 (S.D.N.Y. 2001) (preliminary injunction against use of plaintiff's trademark in jewelry advertising); *Fun-Damental Too, Ltd. v. Gemmy Indus. Corp.*, 111 F.3d 993, 997-98 (2d Cir. 1997) (affirming preliminary injunction against use of similar packaging).

Plaintiffs respectfully submit that they are entitled to a temporary restraining order and a preliminary injunction since Defendants may have a substantial number of Counterfeit Products in their possession for sale and distribution. Plaintiffs will continue to be irreparably harmed if Defendants are not immediately stopped from selling Counterfeit Products or disposing of related records. Any delay in securing the Counterfeit Products and related records may result in the Defendants disposing or otherwise transferring and selling the merchandise elsewhere.

---

[6] *See also, Int'l Longshoremen's Ass'n v. New York Shipping Ass'n, Inc.*, 965 F.2d 1224, 1228 (2d Cir. 1992) (the same standard applies for both preliminary injunctions and temporary restraining orders).

**B.    Plaintiffs Are Likely To Succeed On Their Trademark Claims.**

**1.    Counterfeit Goods Create A Likelihood of Confusion Under the Lanham Act.**

Plaintiffs are likely to succeed on their claims under Section 32(1) and 43(a) of the Lanham Act, 15 U.S.C. § 1114(1) and 15 U.S.C. § 1125(a).  Section 32(1) of the Lanham Act, 15 U.S.C. § 1114(1), provides in pertinent part:

Any person who shall without the consent of the registrant—

(a) use in commerce any reproduction, counterfeit, copy, or colorable imitation of a registered mark in connection with the sale, offering for sale, distribution, or advertising of any goods or services on or in connection with which such use is likely to cause confusion, or to cause mistake, or to deceive … shall be liable in a civil action by the registrant for the remedies hereinafter provided.

Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a), provides in pertinent part:

[a]ny person who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which—

(A) is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person … shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act.

In a counterfeiting case such as this one, Plaintiffs must show (1) that they have a valid mark that is entitled to protection under the Lanham Act and (2) that the defendant's actions are likely to cause confusion as to the origin of the mark.  *Gucci Am., Inc. v. Duty Free Apparel Ltd.*, 286 F. Supp. 2d 284, 287 (S.D.N.Y. 2003) (citation omitted) (summary judgment against counterfeiter).  The same elements apply to counterfeiting claims brought under Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a), the latter being a broader provision that also reaches unregistered trademarks.  *Id.* (citing *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 155 (2d Cir. 2002)).

As to the first prong, HBI's federal trademark registrations (attached to the Wharton Affidavit as Exhibits A-F) establish that it owns the CHAMPION Marks and that those marks are valid. Pursuant to 15 U.S.C. § 1057(b), registration of the marks provides proof of ownership:

> [a] certificate of registration of a mark upon the principal register provided by this chapter shall be prima facie evidence of the validity of the registered mark and of the registration of the mark, of the registrant's ownership of the mark, and of the registrant's exclusive right to use the registered mark in commerce on or in connection with the goods or services specified in the certificate, subject to any conditions or limitations stated in the certificate.

Several of HBI's registrations have become incontestable pursuant to 15 U.S.C. § 1065. Although the SUPER HOOD mark does not enjoy the advantages conferred by 15 U.S.C. § 1057(b) as it is registered on the Supplemental Register, Plaintiffs' use of the mark since as early as 2002 coupled with widespread advertising of the mark leaves no legitimate argument regarding ownership.

A proper likelihood of confusion analysis, whether conducted under 15 U.S.C. § 1114(1) (for infringement of a registered mark) or 15 U.S.C. § 1125(a) (for infringement of rights in a mark acquired by use) of the Lanham Act, looks at the factors set forth in *Polaroid Corp. v. Polarad Elecs. Corp.*, 287 F.2d 492, 495 (2d Cir. 1961): (1) the strength of the plaintiff's trademark; (2) the similarity of defendant's mark to plaintiff's; (3) the proximity of the products sold under defendant's mark to those sold under plaintiff's; (4) where the products are different, the likelihood that plaintiff will bridge the gap by selling products sold by defendants; (5) the existence of actual confusion among consumers; and (6) the sophistication of consumers. *Virgin Enters.*, 335 F.3d at 146-47.

In this case, however, the Court need not necessarily undertake a factor-by-factor analysis because counterfeits, by their very nature, cause confusion. *See Gucci Am.,* 286 F. Supp. 2d at

287 (citing *Topps Co., Inc. v. Gerrit J. Verburg Co.*, No. 96-7302, 1996 WL 719381, at *6 (S.D.N.Y. Dec. 13, 1996) ("Where the marks are identical, and the goods are also identical and directly competitive, the decision can be made directly without a more formal and complete discussion of all of the Polaroid factors."). Indeed, confusing the customer is the purpose of creating counterfeit goods. *See In re Vuitton et Fils S.A.*, 606 F.2d 1, 5 (2d Cir. 1979) (granting writ of mandamus awarding temporary restraining order because "the very purpose of the individual marketing the cheaper [and virtually identical] items is to confuse the buying public into believing it is buying the true article."). As one court aptly observed:

> It would be difficult to imagine a clearer case of consumer confusion than the instant case in which the defendants, acting in direct competition with the plaintiff, sold counterfeit products on which plaintiff's registered marks appear in their entirety. Under these circumstances, the likelihood of consumer confusion, mistake or deception is clear.

*Microsoft Corp. v. CMOS Techs., Inc.*, 872 F. Supp. 1329, 1335 (D.N.J. 1994).

Here, the facts support a finding of a likelihood of confusion. The Counterfeit Products bear marks that are identical to Plaintiffs' CHAMPION and SUPER HOOD Marks. In addition, the counterfeit sweatshirts and authentic goods compete directly with one another, sometimes appearing in the same store next to one another.[7]  *See* Ortiz 5. Because Defendants traffic in counterfeit goods, indeed exacting replicas of authentic goods, the Counterfeit Products by definition cause confusion.

---

[7] Although an appropriate heuristic means of investigating similarities between products, district courts must focus on the ultimate issue of likelihood confusion and thus analyze the products in light of the way in which they are actually displayed in the purchasing context. *See, e.g., Malletier v. Burlington Coat Factory Warehouse, Corp.*, 426 F.3d 532, 538 (2d Cir. 2005) ("the test of confusion [under the Lanham Act] is not whether the products can be differentiated when [they] are subject to a side-by-side comparison. Instead, we must ask whether they create the same general overall impression such that a consumer who has seen [plaintiff's] trade dress would, upon later seeing [defendant's] trade dress alone, be confused.") (citing *Fun-Damental Too*, 111 F.3d at 1004 (2d Cir. 1997)).

## 2. Copying Results In A Presumption Of Likelihood Of Confusion.

The Court may also conclude that a likelihood of confusion exists because the Defendants intentionally copied the CHAMPION and SUPER HOOD Marks. *New York Soc'y of Certified Public Accountants v. Eric Louis Assocs., Inc.*, 79 F. Supp. 2d 331, 340 (S.D.N.Y. 1999) (upon showing of intentional copying, a "likelihood of confusion will be presumed as a matter of law."), *citing Mobil Oil Corp. v. Pegasus Petroleum Corp.*, 818 F.2d 254, 258 (2d Cir. 1987). A review of the Counterfeit Products and Plaintiffs' authentic goods reveals the overwhelming similarities and blatant copying of Plaintiffs' federally registered CHAMPION and SUPER HOOD Marks. *Compare* Heller Ex. D with Heller Ex. E. Defendants go so far as to completely copy the hangtag found on authentic sweatshirts. Heller 15. This showing of bad faith entitles Plaintiffs to a presumption of confusion in the marketplace. *See Kraft Gen. Foods, Inc. v. Allied Old English, Inc.*, 831 F. Supp. 123, 132 (S.D.N.Y. 1993) (courts may infer confusion and intent to capitalize on the plaintiff's goodwill "[w]hen a company appropriates an identical mark that is well known and has acquired secondary meaning"); *see also GTFM, Inc. v. Solid Clothing, Inc.*, 215 F. Supp. 2d 273, 297 (S.D.N.Y. 2002) ("'Where a second-comer acts in bad faith and intentionally copies a trademark or trade dress,' however, 'a presumption arises that the copier has succeeded in causing confusion.'") (*citing Paddington Corp. v. Attiki Importers & Distrib., Inc.*, 996 F.2d 577, 586-87 (2d Cir.1993)).

## C. Plaintiffs Will Suffer Irreparable Harm In the Absence Of A Temporary Restraining Order and Preliminary Injunction.

As a well established matter of law in the Second Circuit, a showing of a likelihood of confusion in trademark infringement cases is sufficient to establish irreparable harm. *Hasbro, Inc. v. Lanard Toys, Ltd.*, 858 F. 2d 70, 73 (2d Cir. 1988) ("In a Lanham Act case a showing of likelihood of confusion establishes both a likelihood of success on the merits and irreparable

harm [ ] assuming the plaintiff has a protectible mark") (citations omitted); *Malletier v. Burlington Coat Factory Warehouse, Corp.*, 426 F.3d 532, 537 (2d Cir. 2005) (same). Indeed, "[i]n a trademark case such as this, a substantial likelihood of confusion constitutes, in and of itself, irreparable injury sufficient to satisfy the requirements of Rule 65(b)(1)." *In re Vuitton et Fils S.A.*, 606 F. 2d at 4 (affirming grant of *ex parte* temporary restraining order).

Plaintiffs need not, however, rely solely on this presumption. If the Court does not issue an injunction, Plaintiffs will suffer very real harm in the form of damage to its reputation and goodwill in addition to unquantifiable lost sales. *See* Heller 23; *see also Paco Rabanne Parfums, S.A. v. Norco Enters., Inc.*, 680 F.2d 891, 894 (2d Cir. 1982) ("Where there is … such high probability of confusion, injury irreparable in the sense that it may not be fully compensable in damages almost inevitably follows … [t]he likelihood of damage to reputation and good will, even where there is no proof of lost sales … [and] entitles a plaintiff to preliminary relief.") (citation omitted); *Multi-Local Media Corp. v. 800 Yellow Book, Inc.*, 813 F. Supp. 199, 202 (E.D.N.Y. 1993) ("Federal courts have long recognized the need for immediate injunctive relief in trademark infringement cases due to the amorphous nature of the damage to the trademark and the resulting difficulty in proving monetary damages."); Wharton 4, Ex. G (remarks of President George W. Bush upon signing the bipartisan Stop Counterfeiting in Manufactured Goods Act, Mar. 16, 2006) ("Counterfeiting costs our country hundreds of billion dollars a year. It has got a lot of harmful effects in our economy. Counterfeiting hurts businesses. They lose their right to profit from their innovation. Counterfeiting hurts workers, because counterfeiting undercuts honest competition [and] rewards illegal competitors.").

Thus, both the presumptions of law discussed above and specific facts support a showing that Plaintiffs have been and will continue to be irreparably harmed by Defendants' activities.

### D.    The Balance Of Hardships Tips In Plaintiffs' Favor.

When Defendants' blatant use of the CHAMPION and SUPER HOOD Marks in connection with sweatshirts is balanced against Plaintiffs' substantial efforts over the years to build up and maintain substantial goodwill and reputation under these marks, the balance of the hardships tips decidedly in favor of Plaintiffs.  Defendants' conduct places Plaintiffs' goodwill and reputation in the hands of Defendants.  Although the quality of Defendants goods is similar to authentic goods, it is not the same.  Heller 19.  Moreover, the "actual quality of the goods is irrelevant; it is the control of quality that a trademark holder is entitled to maintain." *Polymer Tech. Corp. v. Mimran*, 975 F.2d 58, 62 (2d Cir. 1992).  Because Plaintiffs have no control over the quality of Defendants' goods bearing their marks, this factor weighs in favor of Plaintiffs.

Moreover, should Defendants' counterfeiting continue, countless consumers and members of the trade will be misled into believing that Counterfeit Products are authentic goods manufactured or otherwise approved by Plaintiffs.  The hardships that befall Plaintiffs and others demonstrates that the balance of the hardships tip in favor of Plaintiffs.  *See Reuters Ltd. v. United Press Int'l*, 903 F.2d 904, 909 (2d Cir. 1990) ("irreparable harm discussed earlier" meets plaintiff's burden under the balance of hardships); Stop Counterfeiting in Manufactured Goods Act, Pub. L. No. 109-181, 120 Stat. 285 (codified in various sections of Title 18, United States Code) (Congressional finding that "the United States economy is losing millions of dollars in tax revenue and tens of thousands of jobs because of the manufacture, distribution, and sale of counterfeit goods").  In contrast, Defendants may easily sell apparel that does not infringe Plaintiffs' rights and trade on their goodwill and reputation.

When considering what harm a restraining order and preliminary injunction may have on Defendants, there is serious doubt that the Court should even consider any alleged commercial interests that Defendants may assert since Defendants are deliberately copying Plaintiffs' marks

and trading upon Plaintiffs' goodwill. *See, e.g., My-T-Fine Corp. v. Samuels*, 69 F.2d 76, 78 (2d Cir. 1934); *Colgate-Palmolive Co. v. North Am. Chem. Corp.*, 238 F. Supp. 81, 87 (S.D.N.Y. 1964). However, even if such interests are weighed, this Court should give greater consideration to the fact that defendants are believed to have been distributing the infringing merchandise for only a short period of time and that the property rights that Defendants are willfully misappropriating are the results of many years of significant effort by and expense to the Plaintiffs. *See Safeway Stores, Inc. v. Safeway Properties, Inc.*, 307 F.2d 495, 500 (2d Cir. 1962); *Blue Bell, Inc. v. Maverick Sportswear, Inc.*, 184 U.S.P.Q. 77, 79-80 (S.D.N.Y. 1974).

      **E.**      **Plaintiffs Also Satisfy The Alternate Standards For A Preliminary Injunction.**

Plaintiffs are also entitled to a preliminary injunction under the alternate standard set as Plaintiffs have established a serious question going to the merits and a balance of hardships tipping decidedly in its favor. *Virgin Enters.,* 335 F.3d at 145; *see also Le Sportsac, Inc. v. K Mart Corp.*, 754 F.2d 71, 74 (2d Cir. 1985) (affirming preliminary injunction).

As long as there is at least one issue of sufficient importance "going to the merits to create a firm ground for litigation," Plaintiffs have met their burden under this standard. *Reuters*, 903 at 909 (reversing denial of preliminary injunction). Because Plaintiffs have raised the important issue of whether Defendants traffic in counterfeit goods, Plaintiffs have raised a substantial question that are firm ground for litigation. In addition, the balance of the hardships tips decidedly in Plaintiffs' favor as set forth above.

      **F.**      **Plaintiffs Have Met The Standards For An Seizure Order.**

The courts have long recognized the need for seizure orders to prevent the destruction or transfer of counterfeit goods in order to protect a plaintiff's rights and remedies as well as preserve the authority of the court. *See, e.g., In re Vuitton*, 606 F.2d at 4 (recognizing how

counterfeiters, once identified by mark owners, destroy or transfer counterfeit merchandise and

how such conduct stymies enforcement). In enacting the Counterfeit Act, Congress explained

that absent relief, counterfeiters could conceal or otherwise destroy counterfeit goods and

records, here discussing the need for *ex parte* relief:

> The purpose of the *ex parte* seizure provision is to provide victims of counterfeiting with a means of ensuring that the courts are able to exercise their jurisdiction effectively in counterfeiting cases. Testimony before both the House and Senate Judiciary Committees established that many of those who deal in counterfeits make it a practice to destroy or transfer counterfeit merchandise when a day in court is on the horizon. The *ex parte* seizure procedure is intended to thwart this bad faith tactic, while ensuring ample procedural protections for persons against whom such orders are issued. In essence, both the Senate and House bills permitted issuance of an *ex parte* seizure order if the applicant could show that the defendant would not comply with a lesser court order, such as a temporary restraining order, and that there was no means of protecting the court's authority other than to seize the property in question on an *ex parte* basis.

130 Cong. Rec. H12080 (daily ed. Oct. 10, 1984).

The Counterfeiting Act, codified at 15 U.S.C. § 1116(d), requires the court to make

certain findings prior to the issuance of an *ex parte* seizure order, such as:

> (i) an order other than an *ex parte* seizure order is not adequate to achieve the purposes of Section 32 of the Act [15 U.S.C. § 1114];
> (ii) the applicant has not publicized the requested seizure;
> (iii) the applicant is likely to succeed in showing that the person against whom seizure would be ordered used a counterfeit mark in connection with the sale, offering for sale, or distribution of goods or services;
> (iv) an immediate and irreparable injury will occur if such seizure is not ordered;
> (v) the matter to be seized will be located at the place identified in the application;
> (vi) the harm to the applicant of denying the application outweighs the harm to the legitimate interests of the person against whom seizure would be ordered of granting the application; and
> (vii) the person against whom seizure would be ordered, or persons acting in concert with such person, would destroy, move, hide, or otherwise make such matter inaccessible to the court, if the applicant were to proceed on notice to such person.
> 15 U.S.C. § 1116(d)(4).

17

These requirements may be divided into three logical categories. The first and seventh considerations ask the Court to consider whether an seizure order is the appropriate instrument for preserving evidence of defendant's counterfeiting. The third, fourth, and sixth considerations ask the Court to determine whether equity favors the issuance of the seizure order. The second and fifth considerations serve to protect the defendant's procedural rights. An analysis of these statutory requirements reveals that a seizure order is appropriate in this case. Rather than an *ex parte* seizure, Plaintiffs seek a seizure immediately after notice has been given and Defendants have an opportunity to be heard by this Court. Although Plaintiffs do not seek an *ex parte* seizure order, the same policy concerns apply and a seizure order should issue at the earliest possibility.

     1.     **A Seizure Order Is the Only Relief That Will Adequately Protect Plaintiffs' Trademark Rights.**

Despite an increase in the number of lawsuits filed concerning counterfeiting, counterfeiters continue to furtively release counterfeit goods into the marketplace. They do so by adopting a criminal mentality that often leads to a plethora of aliases, false addresses, and fleeting operations that close as quickly as they open. One court observed that "[t]he agility and resourcefulness of wholesale and retail purveyors of counterfeit trademarked goods is at one with the business acumen of cocaine dealers, as is demonstrated in Vuitton's previous attempts by litigation to quell distribution of cheap bogus merchandise which dilutes its valued mark." *United States ex rel. Vuitton et Fils S.A. v. Karen Bags, Inc.*, 592 F. Supp. 734, 743 n.4 (S.D.N.Y. 1984).

Plaintiffs strongly believe that the Defendants are not unlike any other counterfeiter and, that if a seizure order does not issue as soon as practicable, Defendants will conceal or destroy Counterfeit Products and related business records. Under such circumstances, a seizure order is

the only way to preserve business records and Counterfeit Products, protect Plaintiffs' rights and possible remedies – including the ability to identify the source of the Counterfeit Products, and preserve the authority of the Court.

**2.    Equitable Considerations Support A Seizure Order.**

The equitable considerations pertaining to the temporary restraining order and preliminary junction, such as irreparable harm, discussed above at Section III(C), (D), are germane here and will not be repeated.  In addition to the equitable consideration, 15 U.S.C. § 1116(d)(4)(B)(iii) requires that Plaintiffs demonstrate that they are likely to prove that Defendants "used a counterfeit mark in connection with the sale, offering for sale, or distribution of goods or services."  The supporting declarations and exhibits demonstrate the bogus nature of Defendants' products.  Section 1116(d)(4)(B)(iv) of Title 15 requires that Plaintiffs demonstrate that "immediate and irreparable injury will occur" if the seizure application is denied.  As discussed above, Plaintiffs are and will be harmed in myriad ways from Defendants' counterfeiting.  In addition to these harms, a seizure order is the only way to ensure the preservation of evidence.

Moreover, Congress recognized how counterfeiting equates to an "immediate and irreparable injury":

> The fourth required finding, derived from both the Senate and House bills, is that an "immediate and irreparable injury" will occur if a seizure is not ordered.  This will not ordinarily be a difficult showing in a counterfeiting case.  If the mark in question is likely to be found counterfeit, then the applicant will ordinarily be able to show irreparable harm that the goods are likely to be distributed if their seizure is not ordered.  The courts have repeatedly held that the distribution of infringing goods constitutes irreparable injury sufficient to order preliminary relief.  *See, e.g., In re Vuitton et Fils S.A.*, 606 F.2d 1, 4 (2d Cir. 1979); *Helene Curtis Industries, Inc. v. Church & Dwight Co.*, 560 F.2d 1325, 1332-33 (7th Cir. 1977), *cert. denied*, 434 U.S. 1070 (1978); *Omega Importing v. Petri-Kine Camera Co.*, 451 F.2d 1190, 1195 (2d Cir. 1971).  Since the marks at issue here are not merely infringing but counterfeit marks, this conclusion will be still more easily reached.

130 Cong. Rec. H12081 (daily ed. Oct. 10, 1984).

Finally, 15 U.S.C. § 1116(d)(4)(B)(vi) requires the Court to find that Plaintiffs' equitable interests outweigh Defendants' interests. Defendants have no legitimate interest in trafficking in counterfeit goods. Plaintiffs' interests in protecting its goodwill and reputation, market share, and making legitimate sales far outweighs any interest of the Defendants. Again, Congress recognized this:

> In cases in which the other listed requirements are satisfied, the sponsors do not anticipate that this showing will be a difficult one. The hardship to a plaintiff caused by the distribution of goods bearing counterfeit marks will usually be great; a defendant's legitimate interest in retaining counterfeits, which he or she would hide or destroy if notified of the suit, will normally be minimal.

130 Cong. Rec. H12081 (daily ed. Oct. 10, 1984).

Accordingly, the equitable considerations found in Section 1116(d)(4)(B) support the issuance of a seizure order.

### 3. Plaintiffs Have Satisfied the Procedural Requirements Set Forth In Sections 1116(d)(2) & (d)(4)(b).

Section 1116(d)(2) requires that a plaintiff seeking a seizure order provide reasonable notice to the United States Attorney in the district in which the action is filed. Plaintiffs provided notice to the United States Attorney for the Southern District of New York on January 15, 2008. A copy of the notice is filed herewith. *See* Wharton 5, Ex. H.

Section 1116(d)(4)(B)(ii)  requires that a plaintiff not publicize the requested seizure order.  Plaintiffs have not publicized this motion as it is in their own interest to maintain its secrecy to ensure the preservation of counterfeit goods and related records. In addition, Plaintiffs have demonstrated that "the matter to be seized will be located at the place identified in the application." 15 U.S.C. § 1116(d)(4)(B)(v). The accompanying affidavits identify the addresses from which Defendants have been offering for sale and selling Counterfeit Products. *See*

Martinez 15, Exhibit J (setting forth the street addresses at which Counterfeit Products were purchased).

## IV.   <u>CONCLUSION</u>

For the foregoing reasons and as supported by the accompanying declarations, Plaintiffs respectfully request that the Court grant Plaintiffs' motion for a temporary restraining order, seizure order, preservation order, and an order to show cause why a preliminary injunction should not issue, together with such other and further relief as the Court deems just and proper.


Dated: New York, New York                    MORGAN & FINNEGAN LLP
      February 5, 2008

                                       By: _/s/ Colin Foley_____
                                       Gerard A. Haddad
                                       Joseph Colin Foley
                                       Danielle Tully
                                         Three World Financial Center
                                       New York, New York  10281-2101
                                       Telephone: (212) 415-8700


*Of Counsel:*

WOMBLE CARLYLE SANDRIDGE &
RICE, PLLC
Michael E. Ray, *pro hac vice application pending*
Jacob S. Wharton, *pro hac vice application pending*
One West Fourth Street
Winston Salem, North Carolina  27101
Telephone:  (336) 721-3600

                                       *Attorneys for Plaintiffs Hanesbrands Inc. and*
                                       *HBI Branded Apparel Enterprises, Ltd.*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------- x
                                  :

HANESBRANDS INC. and HBI BRANDED
APPAREL ENTERPRISES, LLC,
                                  :

                           Plaintiffs,         :        Civil Action No. 08 CV 0545 (VM)
                                  :

        - against -                    :

METRO SPORTS INC. (d/b/a PLAYERS SPORTS,
d/b/a HOT DOT, d/b/a HIP HOP SPORTSWEAR);
HOT DOT FASHION, INC.; HIP HOP
SPORTSWEAR INC.; MICHAEL FASHIONS INC.
(d/b/a MICHAEL FASHION); LONDON BOY
SPORTSWEAR, LTD. (d/b/a LONDON BOY);
TRANDZ N.Y., CORP. (d/b/a OCTANE); OCTANE
NYC INC. (d/b/a OCTANE); FLASH SPORTS, INC.;
104TH ST. FASHION INC. (d/b/a 104 STREET
FASHIONS, d/b/a 104 FASHIONS); F.T.C. FASHION;
various JOHN and JANE DOES, and XYZ
COMPANIES (UNIDENTIFIED),

                          Defendants.       :
-------------------------------------------------------------- x

## AFFIDAVIT OF RICHARD HELLER

COMES NOW, Richard Heller, and, being duly sworn, testifies as follows:

1. I am Senior Marketing Manager for Champion Athleticwear, a division of Hanesbrands Inc. I have more than 10 years experience marketing Champion® brand athletic wear. I have been in charge of marketing the Super Hood® sweatshirts since 1999. I have personal knowledge of the information contained in this declaration unless otherwise indicated. I am over eighteen years of age and competent to provide this testimony.

2. I respectfully submit this affidavit in support of Plaintiffs' Motion for a Temporary Restraining Order (*Ex Parte*), Seizure Order (*Ex Parte*), Expedited Discovery Order (*Ex Parte*), Preservation Order (*Ex Parte*), Order to Show Cause Why A Preliminary Injunction Should Not Issue, and Secrecy Order (*Ex Parte*).

3. Hanesbrands is a global consumer goods company with more than a century of history and a portfolio of leading apparel essentials, including T-shirts, bras, panties, men's underwear, kids' underwear, socks, hosiery, casualwear, and activewear – including sweatshirts. Some of its brands include Hanes®, Champion®, Playtex®, Bali®, L'eggs®, Just My Size®, Barely There®, and Wonderbra®.

4. Based on a recent survey, Hanesbrands can be found in eight out of 10 American households, and they are sold in hundreds of stores, plus via the Web and catalogs. *See* Exhibit A (excerpt from Hanesbrands Web site).

5. The Champion® brand enjoys a rich heritage dating back to 1919 and prides itself as an originator and innovator of men's and women's sports apparel. *See* Exhibit B (excerpt from Hanesbrands Web site).

6. The Champion® brand has a reputation both in the United States and around the world for high-quality products sold under the CHAMPION trademark and "C" logo (collectively the "CHAMPION Marks").

7. Under its Champion® brand, Hanesbrands manufactures and sells sweatshirts under both the CHAMPION Marks and the SUPER HOOD mark (collectively the "CHAMPION and SUPER HOOD Marks"). Examples of the trademarks may be found attached hereto as Exhibit C.

8. The CHAMPION Marks have been used in connection with sweatshirts at least as early as the mid-1960's.

9. Plaintiffs have used the SUPER HOOD mark in connection with sweatshirts since as early as 2002.

10. The CHAMPION and SUPER HOOD Marks are owned by HBI and licensed to Hanesbrands.

11. Hanesbrands recently discovered that counterfeit Super Hood® sweatshirts are being sold in New York City. Once the counterfeiting was discovered, Hanesbrands investigated the matter through Manuel Martinez, Allen Ortiz, and Ruandy Melo (collectively the "Investigators").

12. The Investigators were asked to purchase counterfeit products, deliver the products to Mr. Martinez, and provide all information about the transaction, including any receipts obtained.

13. As a result of the investigation, I received 10 sweatshirts on or about Monday, December 10, 2007 from Jacob Wharton at Womble Carlyle Sandridge & Rice, PLLC, Plaintiffs' counsel.

14. I reviewed each of the 10 sweatshirts. Each bears exacting replicas of the CHAMPION and SUPER HOOD Marks. However, after a thorough investigation of each sweatshirt, I conclude that all 10 are counterfeits that were not manufactured or sold under the authority of Hanesbrands or Champion Athleticwear.

15. The counterfeit sweatshirts differ from authentic goods in only small details, making it difficult to the untrained eye to distinguish counterfeit and authentic goods. Indeed, the hang tags found on the counterfeit sweatshirts are identical to the genuine hang tags.

However, there are several distinct differences that indicate to me that these are counterfeit sweatshirts.

16. There are several differences that appear in each of the sweatshirts. They are:

- "Made in Malaysia" – this appears on the neck tag of counterfeit sweatshirts but authentic Super Hood® sweatshirts are not made in Malaysia, they are manufactured in Cambodia;



COUNTERFEIT



AUTHENTIC

- Formatting of neck tag – on counterfeits, the formatting of the printing on the tag, including size, attribute, and plant code is poorly printed with letters and numbers inconsistent in spacing or printed unevenly;



COUNTERFEIT



AUTHENTIC

- Neck tape printing – on counterfeits, the CHAMPION script printed on the neck tape is lighter than on authentic goods;



COUNTERFEIT



AUTHENTIC

- Hood construction – although the counterfeits have two-ply hoods, the hood seam on the counterfeits is closed on the outer edge, versus on the interior of the hood on the authentic products. *Compare* Exhibit D (counterfeit) and Exhibit E (authentic).

- Draw cord tipping – the plastic tipping on the ends of hood draw cords are inverted on the counterfeits sweatshirts;


COUNTERFEIT


AUTHENTIC

- Color shade – the navy, brown, and green counterfeits are a much lighter shade than genuine sweatshirts. *Compare* Exhibit D (counterfeit) and Exhibit E (authentic).

- Color description – genuine color descriptions are DARK BROWN, not BROWN; SEAWEED or CAMO (depending on the shade of green), not GREEN; SCARLET, not RED; and URBAN GOLD, not WHEAT. The color description NAVY appears on the counterfeits as well as genuine sweatshirts;


COUNTERFEITS

- Muff pocket stitching – the "muff" or "kangaroo" pockets on the front of counterfeit sweatshirts are sewn to the sweatshirt body directly on the edge of the pocket fabric

whereas on authentic goods the stitching is set in approximately ⅛″ from the edge of the muff pocket fabric.



COUNTERFEIT                                    AUTHENTIC

17. As I reviewed each sweatshirt, I noted the differences which appear for each sweatshirt in the table below along with the name appearing on the store at the place of purchase and the address, as reported by the Investigators. For ease of reference, I use the names of the difference described above to identify differences. Photographs of each counterfeit sweatshirt are attached hereto as Exhibits F-O.

| No. | Store Information | Difference Noted | Ex. |
|---|---|---|---|
| 1 | Hot Dot<br>3542 Broadway<br>New York, New York 10031 | "Made in Malaysia"<br>Formatting of neck tag<br>Neck tape printing<br>Hood construction<br>Draw cord tipping<br>Color shade (navy too light)<br>Muff pocket stitching | F |
| 2 | F.T.C. Fashions<br>3663 Broadway<br>New York, New York 10031 | "Made in Malaysia"<br>Formatting of neck tag<br>Neck tape printing<br>Hood construction<br>Draw cord tipping<br>Color shade (brown too light)<br>Color description (should be DARK BROWN)<br>Muff pocket stitching | G |

| 3 | Metro Sports<br>565 West 145th Street<br>New York, New York 10031 | "Made in Malaysia"<br>Formatting of neck tag<br>Neck tape printing (and is upside down on this particular garment)<br>Hood construction<br>Draw cord tipping<br>Color shade (navy too light)<br>Muff pocket stitching | H |
| 4 | Metro Sports<br>2946 Third Avenue<br>New York, New York 10455 | "Made in Malaysia"<br>Formatting of neck tag<br>Neck tape printing<br>Hood construction<br>Draw cord tipping<br>Color shade (gold color too light)<br>Color description (should be URBAN GOLD)<br>Muff pocket stitching | I |
| 5 | Michael Fashion<br>2936 Third Avenue<br>New York, New York 10455 | "Made in Malaysia"<br>Formatting of neck tag<br>Neck tape printing<br>Hood construction<br>Draw cord tipping<br>Color shade (navy too light)<br>Muff pocket stitching | J |
| 6 | London Boy<br>2908 Third Avenue<br>New York, New York 10455 | "Made in Malaysia"<br>Formatting of neck tag<br>Neck tape printing<br>Hood construction<br>Draw cord tipping<br>Color shade (green too light)<br>Color description (should be SEAWEED)<br>Muff pocket stitching<br>In addition, the printing on the UPC ticket is of poor quality with the "L" in "LARGE" spaced apart from the "ARGE." | K |
| 7 | Octane<br>560 Melrose Avenue<br>New York, New York 10455 | "Made in Malaysia"<br>Formatting of neck tag<br>Neck tape printing<br>Hood construction<br>Draw cord tipping<br>Color shade (green too light)<br>Color description (should be SEAWEED)<br>Muff pocket stitching | L |

| 8 | Flash Sportswear<br>16W 125th Street<br>New York, New York 10027 | "Made in Malaysia"<br>Formatting of neck tag<br>Neck tape printing<br>Hood construction<br>Draw cord tipping<br>Color shade (navy too light)<br>Muff pocket stitching | M |
|---|---|---|---|
| 9 | Metro Sports<br>118 West 125th Street<br>New York, New York 10027 | "Made in Malaysia"<br>Formatting of neck tag<br>Neck tape printing<br>Hood construction<br>Draw cord tipping<br>Color shade (navy too light)<br>Muff pocket stitching | N |
| 10 | 104 Street Fashions<br>1887 Third Avenue<br>New York, New York 10029 | "Made in Malaysia"<br>Formatting of neck tag<br>Neck tape printing<br>Hood construction<br>Draw cord tipping<br>Color shade (brown too light)<br>Color description (should be DARK BROWN)<br>Muff pocket stitching | O |

18. I attach hereto the counterfeit sweatshirt described as No. 2 above as Exhibit D for the Court's review. For comparison purposes, I attach a genuine Super Hood® sweatshirt as Exhibit E.

19. The review of the 10 sweatshirts confirmed that they are of inferior quality. The construction of the hood and muff pocket is of inferior quality and the coloration of at least the navy, green, brown, and yellow counterfeit sweatshirts is of inferior quality to genuine Super Hood® sweatshirts.

20. A review of the receipts provided by the Investigators confirms that the counterfeit sweatshirts are selling for less than authentic goods. The counterfeit sweatshirts sell for from $45.00 to $55.00 while genuine sweatshirts sell for at least $60.00.

21. The investigation also confirmed that Hanesbrands or Champion Athleticwear did not manufacture, inspect, package, or authorize Defendants or anyone else to manufacture, distribute, offer for sale, and sell the counterfeit sweatshirts.

22. Hanesbrands and Champion Athleticwear have invested considerable resources marketing, advertising, and promoting the Super Hood® sweatshirt. As such, Super Hood® sweatshirts have been a commercial success, becoming popular as both athletic and casual wear. Furthermore, Hanesbrands and Champion Athleticwear have invested a great deal of resources marketing, advertising, and promoting Champion® branded products to establish widespread consumer recognition of the brand and the products offered therewith.

23. Should the counterfeit goods continue to flood the market, Hanesbrands and Champion Athleticwear will be injured by the loss of control over its reputation in the marketplace as well as an unknown number of lost sales.

Further affiant sayeth not.

_____
Richard Heller

SWORN to and subscribed before me

this _14th_ day of _January_____, 2008.

_Teresa L. Conrad_____
　　　　　　　Notary Public Teresa L. Conrad

My Commission Expires: _May 7, 2012_

(see attached page)

OFFICIAL SEAL
Notary Public, North Carolina
COUNTY OF FORSYTH
TERESA L. CONRAD
My Commission Expires May 7, 2012

STATE OF NORTH CAROLINA

COUNTY OF FORSYTH

I, Teresa L. Conrad, a Notary Public for said County and State, do hereby certify that Richard Heller, as Affiant on behalf of Hanesbrands Inc. and HBI Branded Apparel Enterprises, LLC, personally appeared before me and acknowledged the due execution of the foregoing instrument.

Witness my hand and official seal, this the _14th_ day of _January_, 200_8_.

[Official Seal]


Notary Public    Teresa L. Conrad

My commission expires _May 7, 2012_.

OFFICIAL SEAL
Notary Public, North Carolina
COUNTY OF FORSYTH
TERESA L. CONRAD
My Commission Expires _May 7, 2012_

**EXHIBIT A**

**TO**

**AFFIDAVIT OF RICHARD HELLER**

Hanesbrands Inc. :: Our Company

http://www.hanesbrands.com/hbi/en-us/OurCompany/Default.htm



# Hbi

OUR COMPANY
OUR BRANDS
OUR VALUES
INVESTORS
NEWSROOM
WORKING AT HBI
SHOP
CONTACT US

About Hanesbrands
History/Timeline
Our Values
Board of Directors
Corporate Officers
Retail Partners
Supplier Partners
FAQs
Contact Us

**HISTORY/TIMELINE**

Our rich history dates back to 1901.
...more ›

# Our company

## HANESbrandsINC



SYMBOL: HBI
(20 min delay)
Open: 26.54
High: 29.84
Last: 29.44
Change: +0.71
Volume: 325,643

search

Based in Winston-Salem, N.C., Hanesbrands Inc. (NYSE:HBI) is a global consumer goods company with more than a century of history and a portfolio of leading apparel essentials including T-shirts, bras, panties, men's underwear, kids' underwear, socks, hosiery, casualwear and activewear. Some of our brands include:

  

· Hanes®
· Champion®
· Playtex®
· Bali®
· L'eggs®
· Just My Size®
· Barely There®
· Wonderbra®

Hanesbrands, which was spun off from Sara Lee Corporation in 2006, has approximately 50,000 employees.

**Financial Information**
Hanesbrands generated $4.7 billion in net sales in fiscal 2005 and more than $350 million in income from operations. Hanesbrands Inc. stock is listed under the symbol HBI on the New York Stock Exchange. The company's daily trading activity, stock price and dividend information are in the financial sections of most major newspapers. Quarterly earnings reports and related news can be found in the **Investors** section.

Our Brands



**EXHIBIT**

tabbies®

**A**

Hanesbrands Inc. :: Our Company

In a recent survey, Hanesbrands can be found in eight out of 10 American households, and they are sold in hundreds of stores, plus Web and catalog. What's more, our brands hold either the number-one or number-two U.S. market position by sales in most product categories in which we compete:

- First in T-shirts, fleece, socks, men's underwear, sheer hosiery and kids' underwear
- Second in bras and panties

For more information on specific brands, please visit **Our Brands.**

Home    Contact Us    Terms of Use    Privacy Policy    Site Map    © 2006 Hanesbrands Inc.

**EXHIBIT B**

TO

**AFFIDAVIT OF RICHARD HELLER**

# HANES*brands*INC

**Hbi**

The Champion C9 Down Sports Bra means better workouts and drier cool-downs.  :::more ›



OUR COMPANY
OUR BRANDS
OUR VALUES
INVESTORS
NEWSROOM
WORKING AT HBI
SHOP
CONTACT US

SYMBOL: HBI
(20 min delay)
Open 28.54
High 29.84
Last 29.44
Change +0.71
Volume 305,648

search

## Our brands

Hanes
Champion
Playtex
Bali
L'eggs
Just My Size
Hanes Hosiery
Barely There
Wonderbra
Outer Banks
Duofold
Additional Brands

Champion

High-quality stylish athletic apparel

:: **Go to Website** ›
:: **Shop** ›

*Champion athletic apparel is for the everyday athlete who is serious about sports and the personal challenge of athletics. While Champion had its beginnings in 1919, the brand took off when the Reverse Weave sweatshirt was introduced and became an instant classic. Today Champion is an international maker of high-quality, authentic athletic apparel and a front-runner in innovation focused on providing athletes with the finest apparel in the world.*

*Champion builds on its heritage as an originator and innovator of men's and women's sports apparel by answering the needs of athletic...*

HISTORY/TIMELINE

Our rich history dates back to 1901.   :::more ›

**EXHIBIT**

**B**

tabbies

Hanesbrands Inc. :: Brands

health-minded people with innovative, high-quality athleticwear and related products.

*Champion* Women's offers a complete line of athleticwear, from high-performance sports bras to classic cotton tees. Our Women's line also offers stylish, technical performance activewear and cover-ups that dry quickly to keep athletes cool and comfortable.

*Champion* Men's offers everything from high-performance moisture management and compression tees and shorts to high-cotton fleece and tees. Our classic jersey and mesh collections are focused on style and comfort.

Innovation is a reflection of *Champion's* integrity and the dedication to offer the best sports apparel possible, with practical, real advances. *Champion* is all about innovation and comfort—and we deliver season after season. For more information, visit **www.championusa.com.**

*Champion and Reverse Weave are trademarks owned by Hanesbrands Inc. or its affiliates.*

Home    Contact Us    Terms of Use    Privacy Policy    Site Map    © 2006 Hanesbrands Inc.

**EXHIBIT C**

**TO**

**AFFIDAVIT OF RICHARD HELLER**

## AFFIDAVIT OF RICHARD HELLER

## EXHIBIT C

| MARK | REGISRATION NO. | GOODS |
|---|---|---|
| **CHAMPION** | 274,178<br>(registered Aug. 29, 1930) | Hosiery |
| Ⅱ | 1,127,251<br>(registered Dec. 4, 1979) | Laundry bags, also suitable for use as sundry bags; pennants and banners; Men's and Boys' Football Uniforms, Athletic Shorts, Men's Neckties, Men's Scarves, Football Jerseys, Jackets, Sweat Pants, **Sweat Shirts**, Warm Up Shirts, Warm Up Pants, Sweat Suits, T-Shirts, One Piece and Two-Piece Physical Education Uniforms, Pullovers, Tank Tops, Polo Shirts, Hats, Caps, Baby Bibs, Baseball Shirts; and Heat Transfer Appliques to be applied to clothing |
| *Champion* | 1,323,337<br>(registered Mar. 5, 1985) | Athletic and Physical Education Uniforms – Namely T-Shirts, Knit Sport Shirts, Athletic Shorts, **Sweat Shirts**, Sweat Pants, Warm-Up Suits, Jackets and Sweaters |
| *Champion* | 1,915,092<br>(registered Aug. 29, 1995) | Clothing, namely hooded and unhooded jerseys, bathrobes, sleepwear, cover-ups, bras, parkas, aerobic wear, namely tops and bottoms, swimwear, pants, shorts, athletic uniforms, physical education uniforms, T-shirts, knit sports shirts, athletic shorts, **sweatshirts**, sweatpants, warm-up suits, jackets, sweaters, vests, wind-resistant |



EXHIBIT

C

| | | clothing, namely tops and bottoms, replica, athletic jerseys, singlets, tights, belts, headbands, wristbands, underwear, and undershirts |
|---|---|---|
| **CHAMPION** | 2,319,994 (registered Feb. 22, 2000) | Physical education uniforms, athletic uniforms, **sweatshirts**, sweatpants, sweaters, T-shirts, socks, shorts, pants, jerseys, bathrobes, sleepwear, cover-ups, bras, parkas, tops and bottoms for use in aerobics, shirts, warm-up suits, jackets, vests, wind resistant pants and jackets, replica athletic jerseys, singlets, tights, belts, headbands, wristbands, underwear, hats, caps, and tank tops |
| **SUPER HOOD** | 3,140,617 (registered Sep. 5, 2006 on the Supplemental Register) | **Sweatshirts**, sweatpants, jackets |

# EX. D. TO HELLER AFFIDAVIT
# FILED WITH THE CLERK'S OFFICE

# EX. E. TO HELLER AFFIDAVIT
# FILED WITH THE CLERK'S OFFICE

**EXHIBIT F**

**TO**

**AFFIDAVIT OF RICHARD HELLER**



**EXHIBIT G**

**TO**

**AFFIDAVIT OF RICHARD HELLER**



EXHIBIT

G

**EXHIBIT H**

**TO**

**AFFIDAVIT OF RICHARD HELLER**



EXHIBIT

H

**EXHIBIT I**

**TO**

**AFFIDAVIT OF RICHARD HELLER**



EXHIBIT
I

**EXHIBIT J**

**TO**

**AFFIDAVIT OF RICHARD HELLER**



EXHIBIT

J

**EXHIBIT K**

**TO**

**AFFIDAVIT OF RICHARD HELLER**



**EXHIBIT L**

**TO**

**AFFIDAVIT OF RICHARD HELLER**



EXHIBIT
L

**EXHIBIT M**

**TO**

**AFFIDAVIT OF RICHARD HELLER**



# 8

EXHIBIT

**M**

**<u>EXHIBIT N</u>**

**TO**

**AFFIDAVIT OF RICHARD HELLER**



<u>**EXHIBIT O**</u>

**TO**

**AFFIDAVIT OF RICHARD HELLER**



# 10

EXHIBIT

O

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

```
-------------------------------------------------------------------- x
                                                         :
HANESBRANDS INC. and HBI BRANDED                         :
APPAREL ENTERPRISES, LLC,                                :
                                                         :
                                                         :    Civil Action No. 08 CV 0545 (VM)
                             Plaintiffs,                  :
                                                         :
          - against -                                    :
                                                         :
METRO SPORTS INC. (d/b/a PLAYERS SPORTS,                 :
 d/b/a HOT DOT, d/b/a HIP HOP SPORTSWEAR);               :
HOT DOT FASHION, INC.; HIP HOP                            :
SPORTSWEAR INC.; MICHAEL FASHIONS INC.                   :
(d/b/a MICHAEL FASHION); LONDON BOY                       :
SPORTSWEAR, LTD. (d/b/a LONDON BOY);                     :
TRANDZ N.Y., CORP. (d/b/a OCTANE); OCTANE                :
NYC INC. (d/b/a OCTANE); FLASH SPORTS, INC.;             :
104TH ST. FASHION INC. (d/b/a 104 STREET                 :
FASHIONS, d/b/a 104 FASHIONS); F.T.C. FASHION;           :
various JOHN and JANE DOES, and XYZ                      :
COMPANIES (UNIDENTIFIED),                                 :
                                                         :
                             Defendants.                 :
                                                         :
-------------------------------------------------------------------- x
```

## AFFIDAVIT OF MANUEL MARTINEZ

COMES NOW, Manuel Martinez, and being duly sworn, testifies as follows:

1.   I am Vice President of Marketing for American Branding Agency Corporation.  I have personal knowledge of the information contained in this affidavit unless otherwise indicated.  I am over eighteen years of age and competent to provide this testimony.

2.   I respectfully submit this affidavit in support of Plaintiffs' Motion for a Temporary Restraining Order (*Ex Parte*), Seizure Order (*Ex Parte*), Expedited Discovery Order (*Ex*

*Parte*), Preservation Order (*Ex Parte*), Order to Show Cause Why A Preliminary Injunction Should Not Issue, and Secrecy Order (*Ex Parte*).

3. From my own personal observations, as well as reports from Allen Ortiz and Ruandy Melo, I am aware that various retailers in the New York metropolitan area are selling sweatshirts that are counterfeit imitations of HBI's Super Hood® sweatshirts (hereinafter "SUPER HOOD sweatshirts") sold under HBI's Champion® Athleticwear brand. I base this on the fact that I have marketed SUPER HOOD sweatshirts for over three years and, based on my familiarity with authentic SUPER HOOD sweatshirts, was able to recognize differences between them as discussed in more detail.

4. I reported this information to Hanesbrands and have continued to assist with gathering information concerning the counterfeit sweatshirts.

5. On behalf of Hanesbrands I coordinated the purchase of counterfeit sweatshirts by myself, Allen Ortiz, and Ruandy Melo. Messrs. Ortiz and Melo purchased counterfeit sweatshirts from the stores listed in their respective affidavits.

6. After Mr. Ortiz and Mr. Melo purchased the sweatshirts, they were given to me along with information concerning the store and any receipts obtained. I purchased a counterfeit sweatshirt from Hot Dot (name on front of store), 3542 Broadway, New York, New York 10031. The receipts from this purchase as well as those made by Messrs. Ortiz and Melo are attached hereto as Exhibits A-I. A receipt was not given for the purchase from F.T.C. Fashion.

7. The receipt obtained from the store located at 3542 Broadway, Exhibit A hereto, lists "Players Sports" and "Metro Sports" as the store names although "Hot Dot" is the name on the outside of the store.

2

8.  I obtained a business card from inside Hot Dot that list "Jay" as "President" of "Hot Dot Sportswear" and shows an address of 3542 Broadway, New York, New York 10031.  The card is attached hereto as part of Exhibit A.

9.  The "Metro Sports" store is located around the corner from "Hot Dot" on West 145th Street, Manhattan, New York 10031.

10. A card obtained from "Metro Sports" at 2946 Third Avenue, Bronx, New York, 10455 is from "Hip Hop Sportswear d/b/a Metro" with an address of 2946 Third Avenue, Bronx New York, 10455, a copy of which is attached hereto as part of Exhibit C.

11. A card obtained from what was "Metro Sports" at 118 West 125th Street, Manhattan, New York 10027 lists "Hip Hop Sportswear d/b/a Metro" with an address of 118 West 125th Street, New York, New York 10027, a copy of which is attached hereto as part of Exhibit H.  However, I visited the store at 118 West 125th Street on January 10, 2008 and at that time saw no counterfeit products for sale.

12. After collecting the sweatshirts and receipts, I conveyed them to attorneys for Hanesbrands at Womble Carlyle Sandridge & Rice, PLLC in Winston-Salem, North Carolina and also reported the names and addresses of the stores where the counterfeit sweatshirts were purchased.

13. I reviewed the counterfeit sweatshirts that I and Mr. Ortiz and Mr. Melo purchased. They look very similar to authentic sweatshirts, including bearing the CHAMPION and SUPER HOOD trademarks on the sweatshirts or tags.  The similarities make it difficult to distinguish between a counterfeit and authentic sweatshirt.

14. However, based on my experience marketing authentic Super Hood® sweatshirts, and through conversations with individuals at Hanesbrands, I understand the differences

between the counterfeit sweatshirts and the genuine SUPER HOOD sweatshirts to include, at the least:

- "Made in Malaysia" – this appears on the neck tag of counterfeit sweatshirts but authentic SUPER HOOD sweatshirts are not made in Malaysia;

- Neck tape printing – on counterfeits, the CHAMPION script printed on the neck tape is lighter than on authentic goods;

- Draw cord tipping – the plastic tipping on the ends of hood draw cords are inverted on the counterfeit sweatshirts;

- Color description – genuine color descriptions are DARK BROWN, not BROWN; SEAWEED or CAMO (depending on the shade of green), not GREEN; SCARLET, not RED; and URBAN GOLD, not WHEAT.  The color description NAVY appears on the counterfeits as well as genuine sweatshirts.

15. A table of the stores from which counterfeit sweatshirts were obtained and the street address of each store is attached hereto as Exhibit J.

16. I visited the following stores on January 10, 2008 and confirmed that they were still selling counterfeit SUPER HOOD sweatshirts:

- London Boy

- Michael Fashion; and

- Octane

4

17. Based on either my personal visit or reports for Messrs. Ortiz and Melo, the signage on the stores selling counterfeits is as follows:

(a)    3542 Broadway, Manhattan, New York 10031 (Hot Dot);

(b)    3663 Broadway, Manhattan, New York 10031 (F.T.C. Fashion);

(c)    565 West 145th Street, Manhattan, New York 10031 (No signage);

(d)    2946 Third Avenue, Bronx, New York 10455 ("Sportswear");

(e)    2936 Third Avenue, Bronx, New York 10455 (Michael Fashion);

(f)    2908 Third Avenue, Bronx, New York 10455 (London Boy);

(g)    560 Melrose Avenue, Bronx, New York 10455 (Octane);

(h)    16 West 125th Street, Manhattan, New York 10027 (Flash Sports);

(i)    1887 Third Avenue, Manhattan, New York 10029 (104 Street Fashions).

Further affiant sayeth not.

Manuel Martinez

SWORN to and subscribed before me

this 18 day of JANUARY , 2008.

_____
Notary Public

My Commission Expires: _____

BARRY FEINBERG
Notary Public, State of New York
No. 01FE4610108
Qualified in Queens County
Commission Expires 09/30/2009

<u>**EXHIBIT A**</u>

**TO**

**AFFIDAVIT OF MANUEL MARTINEZ**

**PLAYERS SPORTS**

METRO SPORTS
565 WEST 145 STREET
NEW YORK, NY  10031
(212)694-8876

|  |  |
|---|---|
| Date Printed: | 12/02/2007 |
| Store:          1 Date: | 12/02/2007 |
| Register:   1-3 Time: | 3:59:52 PM |
| Receipt: | RC0000100009082B |
| Tran type:     Sale | |
| Cashier: | M.K |

| STYLE | DESCRIPTION | |
|---|---|---|
| SZ  SUBSZ COLR | QTY @ PRICE | SUBTTL |

| 25 | SALE | |
|---|---|---|
| ALL      MIX | 1 @ 50.00 | 50.00 |
| Sales Assoc.#M.K | | |

|  | SubTotal | 50.00 |
|---|---|---|
|  | Total Tax | 0.00 |
|  | Total | 50.00 |
|  | Balance | 0.00 |

Payment History

| 12/02/2007 -Cash | 50.00 |
|---|---|

NO REFUND - EXCHANGE ONLY



**EXHIBIT**

**A**

tabbies

<u>**EXHIBIT B**</u>

**TO**

**AFFIDAVIT OF MANUEL MARTINEZ**



```
                    METRO SPORTS
                 565 WEST 145 STREET
                  NEW YORK, NY  10031
                    (212)694-8876

                Date Printed:   12/04/2007
Store:              1 Date:      12/04/2007
Register:    1-1 Time:           4:02:23 PM
Receipt:                    RC00001000090911
Tran type:      Sale
Customer:
Cashier:                            dee
                              RE-PRINT
STYLE              DESCRIPTION
SZ  SUBSZ COLR   QTY @ PRICE       SUBTTL
                              RE-PRINT
25              SALE
ALL      MIX     1 @ 40.00          40.00
Sales Assoc.#dee

                          ---RE-PRINT
                SubTotal            40.00
                Total-Tax           0.00
                   Total            40.00
                    Cash            40.00
                          ---RE-PRINT
                Balance             0.00

           NO REFUND - EXCHANGE ONLY
              WITHIN  7 DAYS ONLY
```

**EXHIBIT**

**B**

**EXHIBIT C**

**TO**

**AFFIDAVIT OF MANUEL MARTINEZ**

```
           METRO SPORTS
          2946 3RD AVENUE
          BRONX, NY  10455
           (718)402-4898

            Date Printed:   12/04/2007
Store:         2 Date:      12/04/2007
Register: 2-1 Time:         5:37:50 PM
Receipt:             RC00002000032926
Tran type:     Sale
Cashier:                         tommy

STYLE              DESCRIPTION
SZ  SUBSZ COLR    QTY @ PRICE   SUBTTL

25                   SALE
ALL     MIX      1 @ 45.00      45.00

                 SubTotal       45.00
                 Total Tax       0.00
                    Total       45.00
                     Cash       45.00

                 Balance        0.00


      NO REFUNDS.  EXCHANGE ONLY
            WITHIN 7 DAYS.
```





EXHIBIT

C

**<u>EXHIBIT D</u>**

**TO**

**AFFIDAVIT OF MANUEL MARTINEZ**

MICHAEL FASHION
NO CASH REFUND STORE
CREDIT ONLY EXCHANGE
ONLY WITH RECEIPT WITH-
IN 7 DAYS & MERCHANDISE
SHOLD BE IN GOOD COND-
ITION WITHOUT BOX THERE
WILL BE NO EXCHANGE. NO
EXCEPTION ALLOWED
THANK YOU FOR SHOPPING
AT MICHAEL FASHION

DEPT17            55.00
ITEM CT            1
CASH           55.00
12-04-2007      PM 05:51
                  8216



EXHIBIT
D

**EXHIBIT E**

TO

**AFFIDAVIT OF MANUEL MARTINEZ**

CREDIT ONLY EXCHANGE
ONLY WITH RECEIPT WITH-
IN 7 DAYS & MERCHANDISE
SHOULD BE IN GOOD COND-
ITION WITHOUT BOX THERE
WILL BE NO EXCHANGE. NO
EXCEPTION ALLOWED
THANK YOU FOR SHOPPING
AT **LONDON BOY**
**K I D S**

```
DEPT02              50.00
ITEM CT             1
CASH             50.00
12-04-2007       PM 05:27
                    7152
```





EXHIBIT

**E**

**<u>EXHIBIT F</u>**

TO

**AFFIDAVIT OF MANUEL MARTINEZ**



**GRAND N.Y. CORP.**

560 Melrose Ave.
Bronx, N.Y. 10455                     (718) 401-4793

| Customer's Order No. | | | | Date 10-8-00 |
|---|---|---|---|---|
| Name | | | | |
| Address | | | | |

| SOLD BY | CASH | C.O.D. | CHARGE | ON ACCT. |
|---|---|---|---|---|

| QTY. | DESCRIPTION | AMOUNT |
|---|---|---|
| | Hoody | $50 |
| | | |
| | poly | |
| | | |
| No cash Refunds | | |
| Exchange only with Receipt within 7 Days | | |
| Layaways held for 30 Days - Exchange | | |
| Layaway within 7 Days | | |

All claims and returned goods MUST be companied by this bill.

Received by

**OCTANE**

Business Card: 560 Melrose Avenue, Bronx NY 10455
Tel: 718-292-1113; Fax: 718-401-4794
www.octanenyc.com
E-mail: octane560@aol.com



EXHIBIT

F

<u>**EXHIBIT G**</u>

**TO**

**AFFIDAVIT OF MANUEL MARTINEZ**

```
FLASH SPORTS
16W. 125TH STREET
NEW YORK, NY 10027


12/08/2007  2:10PM    01
000000#0368      Husam

NO SALE

NO CASH OR CREDITCARD
REFUND, EXCHANGE ONLY
         WITHIN 7 DAYS
```

```
FLASH SPORTS
16W. 125TH STREET
NEW YORK, NY 10027


12/08/2007  3:00PM    01
000000#0369      Husam

DEPT.05        T₁₂ $50.00
MDSE ST           $50.00
TAX1              $0.00

ITEMS          1Q
CASH      $50. 00

NO CASH OR CREDITCARD
REFUND, EXCHANGE ONLY
         WITHIN 7 DAYS
```



Business Card: Flash Sportswear
16W 125th St., New York, NY 10027

Tel: (212)369-7271
"Your Favorite Name-Brand Store"

EXHIBIT

G

**EXHIBIT H**

TO

**AFFIDAVIT OF MANUEL MARTINEZ**

```
              HIP HOP SPORTSWEAR
              118 west   125 st
              new  york, NY 10027
                (212)749-2055

                 Date Printed:   12/06/2007
Store:              6 Date:      12/06/2007
Register:   6-1 Time:            7:07:07 PM
Receipt:              RC00006000046563
Tran type:       Sale
Cashier:                           tommy

STYLE                  DESCRIPTION
SZ  SUBSZ COLR     QTY @ PRICE     SUBTTL

25                     SALE
ALL       MIX      1 @ 50.00        50.00

                   SubTotal         50.00
                   Total Tax         0.00
                   Total            50.00
                   Cash             50.00

                   Balance           0.00

NO REFUNDS.  EXCHANGE ONLY WITHIN 7
DAYS.
```



EXHIBIT

H

**EXHIBIT I**

TO

**AFFIDAVIT OF MANUEL MARTINEZ**

```
104 STREET FASHIONS
1887 THIRD AVENUE
NEW YORK NY 10029
212 423 5713
NO CASH REFUND

12-04-07    MC #:0000
NO SALE
              PM 7-06  5163
```

```
104 STREET FASHIONS
1887 THIRD AVENUE
NEW YORK NY 10029
212 423 5713
NO CASH REFUND

12-04-07    MC #:0000
DEPT 1           *50.00

TOTAL          *50.00
AMOUNT         *60.00
CHANGE         *10.00
           PM 7-16  5164
```

```
104 STREET FASHIONS
1887 THIRD AVENUE
NEW YORK NY 10029
212 423 5713
NO CASH REFUND

12-08-07    MC #:0000
NO SALE
              PM 2-43  5238
```

**EXHIBIT**

**I**

tabbies

**EXHIBIT J**

TO

**AFFIDAVIT OF MANUEL MARTINEZ**

**AFFIDAVIT OF MANUEL MARTINEZ**

**EXHIBIT J**

| Stores from which counterfeit SUPER HOOD sweatshirts were purchased | | |
|---|---|---|
| **Store Name**<br>**(as it appears on signage)** | **Address** | **Receipt** |
| Hot Dot | 3542 Broadway<br>Manhattan, New York 10031 | #1 – Ex. A |
| F.T.C. Fashion | 3663 Broadway<br>Manhattan, New York 10031 | #2 – No receipt |
| No signage | 565 West 145th Street<br>Manhattan, New York 10031 | #3 – Ex. B |
| "Sportswear" | 2946 Third Avenue<br>Bronx, New York 10455 | #4 – Ex. C |
| Michael Fashion | 2936 Third Avenue<br>Bronx, New York 10455 | #5 – Ex. D |
| London Boy | 2908 Third Avenue<br>Bronx, New York 10455 | #6 – Ex. E |
| Octane | 560 Melrose Avenue<br>Bronx, New York 10455 | #7 – Ex. F |
| Flash Sports | 16 West 125th Street<br>Manhattan, New York 10027 | #8 – Ex. G |
| Metro Sportswear | 118 West 125 Street<br>Manhattan, New York 10027 | #9 – Ex. H |
| 104 Street Fashions | 1887 Third Avenue<br>Manhattan, New York 10029 | #10 – Ex. I |

**EXHIBIT**

**J**

_____

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------ x

HANESBRANDS INC. and HBI BRANDED
APPAREL ENTERPRISES, LLC,

                                  Plaintiffs,

            - against -

METRO SPORTS INC. (d/b/a PLAYERS SPORTS,
d/b/a HOT DOT, d/b/a HIP HOP SPORTSWEAR);
HOT DOT FASHION, INC.; HIP HOP
SPORTSWEAR INC.; MICHAEL FASHIONS INC.
(d/b/a MICHAEL FASHION); LONDON BOY
SPORTSWEAR, LTD. (d/b/a LONDON BOY);
TRANDZ N.Y., CORP. (d/b/a OCTANE); OCTANE
NYC INC. (d/b/a OCTANE); FLASH SPORTS, INC.;
104TH ST. FASHION INC. (d/b/a 104 STREET
FASHIONS, d/b/a 104 FASHIONS); F.T.C. FASHION;
various JOHN and JANE DOES, and XYZ
COMPANIES (UNIDENTIFIED),

                              Defendants.

------------------------------------------------------------------ x

Civil Action No. 08 CV 0545 (VM)

## AFFIDAVIT OF RUANDY MELO

COMES NOW, Ruandy Melo, and being duly sworn, testifies as follows:

1. I have personal knowledge of the information contained in this affidavit unless otherwise indicated. I am over eighteen years of age and competent to provide this testimony.

2. I was hired by American Branding Agency Corporation to assist with the investigation of counterfeit SUPER HOOD® sweatshirts in New York City.

3.  I respectfully submit this affidavit in support of Plaintiffs' Motion for a Temporary Restraining Order, Seizure Order, Asset Restraining Order, Expedited Discovery Order, Preservation Order, Order to Show Cause for Preliminary Injunction, and Secrecy Order.

    a.  I was informed by Manuel Martinez that various retailers in the New York metropolitan area are selling counterfeit sweatshirts that are counterfeit Super Hood® sweatshirts (hereinafter "SUPER HOOD sweatshirts") sold under the Champion® Athleticwear brand.  Mr. Martinez also informed me that counterfeit sweatshirts differ from authentic SUPER HOOD sweatshirts in the following manner:  Tags on counterfeit sweatshirts read "RED" instead of "SCARLET" and "GREEN" instead of "CAMO";

    b.  the zippers on the counterfeit sweatshirts have more shine; and

    c.  the inside garment tag on counterfeit sweatshirts would read Made In Malaysia.

4.  Based on this information, I purchased counterfeit sweatshirts from the following locations, with the name appearing on the outside of the store listed, the date of purchase:

- Dec. 4, 2007 – Metro Sports, 2946 Third Avenue, New York, New York 10455
- Dec. 4, 2007 – Michael Fashion, 2936 Third Avenue, New York, New York 10455

5.  I gave the counterfeit sweatshirts and receipts received from the purchases, if any, to Manuel Martinez.

/

/

/

/

/

Further affiant sayeth not.

_____
Ruandy Melo

SWORN to and subscribed before me

this _18_ day of _JANUARY_____, 2008.

_____
Notary Public

My Commission Expires: _____

BARRY FEINBERG
Notary Public, State of New York
No. 01FE4610106
Qualified in Queens County
Commission Expires 09/30/2008

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

--------------------------------------------------------------------- x
                                                  :

HANESBRANDS INC. and HBI BRANDED     :
APPAREL ENTERPRISES, LLC,          :

                                        :     Civil Action No. 08 CV 0545 (VM)

                    Plaintiffs,     :

           - against -            :

                                          :

METRO SPORTS INC. (d/b/a PLAYERS SPORTS,  :
d/b/a HOT DOT, d/b/a HIP HOP SPORTSWEAR);  :
HOT DOT FASHION, INC.; HIP HOP     :
SPORTSWEAR INC.; MICHAEL FASHIONS INC.  :
(d/b/a MICHAEL FASHION); LONDON BOY    :
SPORTSWEAR, LTD. (d/b/a LONDON BOY);    :
TRANDZ N.Y., CORP. (d/b/a OCTANE); OCTANE :
NYC INC. (d/b/a OCTANE); FLASH SPORTS, INC.; :
104TH ST. FASHION INC. (d/b/a 104 STREET   :
FASHIONS, d/b/a 104 FASHIONS); F.T.C. FASHION; :
various JOHN and JANE DOES, and XYZ     :
COMPANIES (UNIDENTIFIED),        :

                                          :

                   Defendants.     :

                                        :
--------------------------------------------------------------------- x

## AFFIDAVIT OF ALLEN ORTIZ

COMES NOW, Allen Ortiz, and being duly sworn, testifies as follows:

1. I have personal knowledge of the information contained in this affidavit unless otherwise indicated. I am over eighteen years of age and competent to provide this testimony.

2. I was hired by American Branding Agency Corporation to assist with the investigation of counterfeit SUPER HOOD® sweatshirts in New York City.

3. I respectfully submit this affidavit in support of Plaintiffs' Motion for a Temporary Restraining Order (*Ex Parte*), Seizure Order (*Ex Parte*), Expedited Discovery Order (*Ex*

*Parte*), Preservation Order (*Ex Parte*), Order to Show Cause for Preliminary Injunction, and Secrecy Order (*Ex Parte*).

4. I was informed by Manuel Martinez that various retailers in the New York metropolitan area are selling counterfeit sweatshirts that are counterfeit Super Hood® sweatshirts (hereinafter "SUPER HOOD" sweatshirts") sold under the Champion® Athleticwear brand. Mr. Martinez also informed me that counterfeit sweatshirts differ from authentic SUPER HOOD sweatshirts in the following manner:

   a. Tags on counterfeit sweatshirts read "RED" instead of "SCARLET" and "GREEN" instead of "CAMO";

   b. the zippers on the counterfeit sweatshirts have more shine; and

   c. the inside garment tag on counterfeit sweatshirts would read Made In Malaysia.

5. Based on this information, I purchased counterfeit sweatshirts from the following locations, with the name appearing on the outside of the store listed, the date of purchase, as well as whether I noticed authentic SUPER HOOD sweatshirts mixed with counterfeits:

- Dec. 6, 2007 – F.T.C. Fashion at 3663 Broadway, Manhattan, New York 10031 (authentic goods were mixed with counterfeits)

- Dec. 4, 2007 – Metro Sports, 565 West 145th Street, Manhattan, New York 10031

- Dec. 4, 2007 – London Boy, 2908 Third Avenue, Bronx, New York 10455 (authentic goods were mixed with counterfeits)

- Dec. 8, 2007 – Octane, 560 Melrose Avenue, Bronx, New York 10455 (authentic goods were mixed with counterfeits)

- Dec. 8, 2007 – Flash Sports, 16 West 125th Street, Manhattan, New York 10027

- Dec. 6, 2007 – Metro Sports, 118 West 125th Street, Manhattan, New York 10027

- Dec. 4, 2007 – 104 Fashions, 1887 Third Avenue, Manhattan, New York 10029

6. I gave the counterfeit sweatshirts and receipts received from the purchases, if any, to Manuel Martinez.

Further affiant sayeth not.

_____
Allen Ortiz

SWORN to and subscribed before me

this _18_ day of _January_____, 2008.

_____
Notary Public

My Commission Expires: _____

BARRY FEINBERG
Notary Public, State of New York
No. 01FE4610106
Qualified in Queens County
Commission Expires 09/30/2009

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

------------------------------------------------------------------- x
                                          :

**HANESBRANDS, INC. and HBI BRANDED**
**APPAREL ENTERPRISES, LLC,**
                                          :
                                          :     Civil Action No. 08 CV 0545 (VM)
                       **Plaintiffs,**        :

                      - against -                :

**METRO SPORTS INC. (d/b/a PLAYERS SPORTS,**   :
**d/b/a HOT DOT, d/b/a HIP HOP SPORTSWEAR);**   :
**HOT DOT FASHION, INC.; HIP HOP**   :
**SPORTSWEAR INC.; MICHAEL FASHIONS INC.**   :
**(d/b/a MICHAEL FASHION); LONDON BOY**   :
**SPORTSWEAR, LTD. (d/b/a LONDON BOY);**   :
**TRANDZ N.Y., CORP. (d/b/a OCTANE); OCTANE**   :
**NYC INC. (d/b/a OCTANE); FLASH SPORTS, INC.;**   :
**104TH ST. FASHION INC. (d/b/a 104 STREET**   :
**FASHIONS, d/b/a 104 FASHIONS); F.T.C. FASHION;**  :
**various JOHN and JANE DOES, and XYZ**   :
**COMPANIES (UNIDENTIFIED),**   :
                                            :
                       **Defendants.**       :
                                            :
------------------------------------------------------------------- x

## AFFIDAVIT OF JACOB S. WHARTON

COMES NOW, Jacob S. Wharton, who, having been duly sworn, testifies as follows:

1. I am attorney for Plaintiffs Hanesbrands, Inc. and HBI Branded Apparel Enterprises, LLC. I have personal knowledge of the information contained in this declaration unless otherwise indicated. I am over eighteen years of age and competent to provide this testimony.

2. I respectfully submit this affidavit in support of Plaintiffs' Motion for a Temporary Restraining Order (*Ex Parte*), Seizure Order (*Ex Parte*), Expedited Discovery Order (*Ex*

*Parte*), Preservation Order (*Ex Parte*), Order to Show Cause Why A Preliminary Injunction Should Not Issue, and Secrecy Order (*Ex Parte*).

3.   Attached hereto as Exhibits A through F are true and correct copies of registration certificates for United States Trademark Registration Numbers 274,178; 1,127,251; 1,323,337; 1,915,092; 2,319,994; and 3,140,617.

4.   Attached hereto as Exhibit G is a true and correct copy off of the White House's Web site of the remarks of President George W. Bush upon signing the bipartisan Stop Counterfeiting in Manufactured Goods Act, Mar. 16, 2006.

5.   Attached hereto as Exhibit H is a true and correct copy of the notice letter sent to the United States Attorney for the Southern District of New York on January 15, 2008 pursuant to 15 U.S.C. § 1116(d)(2).

6.   On or about December 10, 2007 a shipment of 10 sweatshirts with purchase receipts was received from Manuel Martinez.  I conveyed via private courier the sweatshirts and receipts to Richard Heller at 1000 East Hanes Mill Road, Winston-Salem, North Carolina 27105.

Further affiant sayeth not.

_____
Jacob S. Wharton

SWORN to and subscribed before me

this 16th day of January, 2008.

_____
Notary Public

My Commission Expires:  8-25-08

OFFICIAL SEAL
Notary Public, North Carolina
COUNTY OF SURRY
LISA H. HAWKS

2

**EXHIBIT A**

TO

**AFFIDAVIT OF JACOB S. WHARTON**

Int. Cl.: 25

Prior U.S. Cl.: 39

United States Patent and Trademark Office
10 Year Renewal

Reg. No. 274,178
Registered Aug. 19, 1930
Renewal Approved July 10, 1990

## TRADEMARK
## PRINCIPAL REGISTER

## CHAMPION

KAYSER-ROTH CORPORATION (DELA-
WARE CORPORATION)
2303 WEST MEADOWVIEW ROAD
GREENSBORO, NC 27407, ASSIGNEE BY
MESNE ASSIGNMENT, MERGER
WITH AND CHANGE OF NAME
CHAMPION KNITTING MILLS (TEN-
NESSEE CORPORATION) CHATTA-
NOOGA, TN

FOR: HOSIERY, IN CLASS 39 (INT.
CL. 25).

FIRST USE 6-0-1918; IN COMMERCE
6-0-1918.

SER. NO. 71-296,174, FILED 2-18-1930.

*In testimony whereof I have hereunto set my hand
and caused the seal of The Patent and Trademark
Office to be affixed on Aug. 21, 1990.*

COMMISSIONER OF PATENTS AND TRADEMARKS

EXHIBIT
A-1

Registered Aug. 19, 1930        **Trade-Mark 274,178**

Renewed, August 19, 1950 to Holeproof Hosiery Co., of Milwaukee, Wisconsin.

# UNITED STATES PATENT OFFICE

### CHAMPION KNITTING MILLS, OF CHATTANOOGA, TENNESSEE

#### ACT OF FEBRUARY 20, 1905

Application filed February 18, 1930. Serial No. 296,174.

# CHAMPION

## STATEMENT

*To all whom it may concern:*

Be it known that the Champion Knitting Mills, a corporation duly organized under the laws of the State of Tennessee, located and doing business in the city of Chattanooga, county of Hamilton, State of Tennessee, at No. 400 East Main Street, in said city, has heretofore adopted and used the trade-mark shown in the accompanying drawing, for HOSIERY, in Class 39, Clothing.

The trade-mark has been continuously used in its business since June, 1918.

The trade-mark is applied or affixed to the goods and the containers by attaching thereto a printed label on which the trade mark is shown.

Your petitioner hereby appoints Edward H. Merritt, Registered No. 3691, Fort Wayne, Indiana, U. S. A., as its attorney to represent it in the Patent Office of the United States, in causing the registration of said trade-mark, with power of substitution, and revocation, to make amendment therein and sign the name of the applicant thereto, to sign the drawing or facsimile, to receive the certificate of registration and do all things necessary to be done in connection with securing the registration of its trade-mark in the United States Patent Office, as fully as it could have done if personally present.

CHAMPION KNITTING MILLS,
By CLYDE WILKINS,
*President.*

EXHIBIT

A-2

**EXHIBIT B**

TO

**AFFIDAVIT OF JACOB S. WHARTON**

Int. Cls.: 22, 24, 25 and 26

U.S. Cls.: 2, 39, 40 and 50

Reg. No. 1,127,251

**U.S. Patent and Trademark Office**

Reg. Dec. 4, 1979

## TRADEMARK
### Principal Register



Champion Products Inc. (New York corporation)
115 College Ave.
Rochester, N.Y. 14607

For: Laundry Bags, Also Suitable for Use as Sundry Bags —in Class 22. (U.S. Cl. 2).
First use Mar. 1966; in commerce Mar. 1966.
For: Pennants and Banners —in Class 24. (U.S. Cl. 50).
First use Mar. 1966; in commerce Mar. 1966.
For: Men's and Boys' Football Uniforms, Athletic Shorts, Men's Neckties, Men's Scarves, Football Jerseys, Jackets, Sweat Pants, Sweat Shirts, Warm Up Shirts, Warm Up Pants, Sweat Suits, T-Shirts, One-Piece and Two-Piece Physical Education Uniforms, Pullovers, Tank Tops, Polo Shirts, Hats, Caps, Baby Bibs, Baseball Shirts —in Class 25. (U.S. Cl. 39).
First use Mar. 1966; in commerce Mar. 1966.
For: Heat Transfer Appliques to be Applied to Clothing —in Class 26. (U.S. Cl. 40).
First use Mar. 1966; in commerce Mar. 1966.

Ser. No. 49,119. Filed Apr. 11, 1975.

JOHN C. DEMOS., Supervisory Examiner

**EXHIBIT**

tobias'

**B**

**<u>EXHIBIT C</u>**

TO

**AFFIDAVIT OF JACOB S. WHARTON**

Int. Cl.: 25

Prior U.S. Cl.: 39

**United States Patent and Trademark Office**

Reg. No. 1,323,337
Registered Mar. 5, 1985

## TRADEMARK
### Principal Register



Champion Products Inc. (New York corporation)
3141 Monroe Ave.
Rochester, N.Y. 14618

For: ATHLETIC AND PHYSICAL EDUCA-
TION UNIFORMS—NAMELY, T-SHIRTS, KNIT
SPORT SHIRTS, ATHLETIC SHORTS, SWEAT
SHIRTS, SWEAT PANTS, WARM-UP SUITS,
JACKETS AND SWEATERS, in CLASS 25 (U.S.
Cl. 39).

First use Jan. 1, 1968; in commerce Jan. 1, 1968.
Owner of U.S. Reg. No. 1,084,381.

Ser. No. 249,640, filed Feb. 11, 1980.

STEVEN L. CATALANO, Examining Attorney

EXHIBIT

C

tabbies

**<u>EXHIBIT D</u>**

**TO**

**AFFIDAVIT OF JACOB S. WHARTON**

Int. Cl.: 25

Prior U.S. Cl.: 39

Reg. No. 1,915,092

# United States Patent and Trademark Office

Registered Aug. 29, 1995

## TRADEMARK
### PRINCIPAL REGISTER

*Champion*

SARAMAR CORPORATION (DELAWARE COR-
PORATION)
CANNON BUILDING, SUITE 145
861 SILVER LAKE BOULEVARD
DOVER, DE 19901

FOR: CLOTHING, NAMELY HOODED AND
UNHOODED JERSEYS, BATHROBES, SLEEP-
WEAR, COVERUPS, BRAS, PARKAS, AEROBIC
WEAR, NAMELY TOPS AND BOTTOMS,
SWIMWEAR, PANTS, SHORTS, ATHLETIC
UNIFORMS, PHYSICAL EDUCATION UNI-
FORMS, T-SHIRTS, KNIT SPORT SHIRTS, ATH-
LETIC SHORTS, SWEATSHIRTS, SWEAT-
PANTS, WARM-UP SUITS, JACKETS, SWEAT-

ERS, SHIRTS, VESTS, WIND-RESISTANT
CLOTHING, NAMELY TOPS AND BOTTOMS,
REPLICA ATHLETIC JERSEYS, SINGLETS,
TIGHTS, BELTS, HEADBANDS, WRISTBANDS,
UNDERWEAR, UNDERSHIRTS, IN CLASS 25
(U.S. CL. 39).

FIRST USE 12–31–1963; IN COMMERCE
12–31–1963.

OWNER OF U.S. REG. NOS. 1,819,014, 1,860,938
AND OTHERS.

SER. NO. 74–558,724, FILED 8–8–1994.

LESLEY LAMOTHE, EXAMINING ATTORNEY

EXHIBIT
D

**<u>EXHIBIT E</u>**

**TO**

**AFFIDAVIT OF JACOB S. WHARTON**

Int. Cl.: 25

Prior U.S. Cls.: 22 and 39

## United States Patent and Trademark Office

Reg. No. 2,319,994

Registered Feb. 22, 2000

## TRADEMARK
### PRINCIPAL REGISTER

## CHAMPION

CHAMPION PRODUCTS, INC. (NEW YORK CORPORATION)
475 CORPORATE SQUARE DRIVE
WINSTON-SALEM, NC 27105 , BY ASSIGNMENT SARAMAR CORPORATION (DELAWARE CORPORATION) DOVER, DE 19901

FOR: PHYSICAL EDUCATION UNIFORMS, ATHLETIC UNIFORMS, SWEATSHIRTS, SWEATPANTS, SWEATERS, T-SHIRTS, SOCKS, SHORTS, PANTS, JERSEYS, BATHROBES, SLEEPWEAR, COVERUPS, BRAS, PARKAS, TOPS AND BOTTOMS FOR USE IN AEROBICS, SHIRTS, WARM-UP SUITS, JACKETS, VESTS,

WIND RESISTANT PANTS AND JACKETS, REPLICA ATHLETIC JERSEYS, SINGLETS, TIGHTS, BELTS, HEADBANDS, WRISTBANDS, UNDERWEAR, HATS, CAPS, TANK TOPS, IN CLASS 25 (U.S. CLS. 22 AND 39).

FIRST USE 12-31-1952; IN COMMERCE 12-31-1952.

OWNER OF U.S. REG. NOS. 274,178, 1,860,938 AND OTHERS.

SER. NO. 75-197,749, FILED 11-12-1996.

ANDREW A. ROPPEL, EXAMINING ATTORNEY

EXHIBIT

E

**EXHIBIT F**

**TO**

**AFFIDAVIT OF JACOB S. WHARTON**

**Int. Cl.: 25**

**Prior U.S. Cls.: 22 and 39**

**United States Patent and Trademark Office**

Reg. No. 3,140,617
Registered Sep. 5, 2006

## TRADEMARK
### SUPPLEMENTAL REGISTER

# SUPER HOOD

SARA LEE GLOBAL FINANCE, L.L.C. (DELA-
WARE LTD LIAB CO)
1000 E. HANES MILL RD.
WINSTON-SALEM, NC 27105

FOR: SWEATSHIRTS, SWEATPANTS, JACKETS,
IN CLASS 25 (U.S. CLS. 22 AND 39).

FIRST USE 8-2-2002; IN COMMERCE 8-2-2002.

THE MARK CONSISTS OF STANDARD CHAR-
ACTERS WITHOUT CLAIM TO ANY PARTICULAR
FONT, STYLE, SIZE, OR COLOR.

SER. NO. 78-479,312, FILED P.R. 9-7-2004; AM. S.R.
5-18-2006.

CARRIE ACHEN, EXAMINING ATTORNEY

**EXHIBIT**

**F**

**<u>EXHIBIT G</u>**

**TO**

**AFFIDAVIT OF JACOB S. WHARTON**



THE WHITE HOUSE
PRESIDENT
GEORGE W. BUSH



**EXHIBIT**

**G**



For Immediate Release
Office of the Press Secretary
March 16, 2006

## President Signs 'Stop Counterfeiting in Manufactured Goods' Act
Room 350
Dwight D. Eisenhower Executive Office Building

🖹 Fact Sheet: President Signs the Stop Counterfeiting in Manufactured Goods Act

3:07 P.M. EST



VIDEO Multimedia

President's Remarks

🖹 view

THE PRESIDENT: Thank you. Welcome. Thanks for coming. In a few moments, I will sign a bill that protects the hard work of American innovators, strengthens the rule of law, and helps keep our families and consumers safe. The Stop Counterfeiting in Manufactured Goods Act has earned broad support. And I want to thank all those who helped get this bill passed for being here today. I want to thank the lawmakers from both political parties for getting this piece of legislation to this desk. I want to thank the consumer protection groups who have joined us, as well. Thanks for your hard work on this important piece of legislation.

I want to thank the Attorney General, Al Gonzales, who has joined us; the Secretary of Commerce, Carlos Gutierrez; my Secretary of Labor, Elaine Chao. Thank you all for being here. I appreciate the Chairman of the Judiciary -- House Judiciary, Jim Sensenbrenner, for joining us today. I also want to thank the bill's sponsor, Joe Knollenberg from Michigan, as well as Bobby Scott from Virginia. Thank you three members for being here. The senators claim they're voting on important legislation, otherwise they would have been here, too. (Laughter.)



This economy of ours is strong, it's getting stronger. We grew at 3.5 percent last year, the national unemployment is 4.8 percent. People are buying homes, the small business sector is strong, productivity is up. Our country is productive, it's innovative, it's entrepreneurial, and we've got to keep it that way.

One of the problems we have is that people feel comfortable, at times, in trying to take a shortcut to success in the business world. They feel like they can copy existing products, instead of designing their own. In order to keep this economy innovative and entrepreneurial, it's important for us to enforce law, and if the laws are weak, pass new laws, to make sure that the problem of counterfeiting, which has been growing rapidly, is arrested, is held in check.

Counterfeiting costs our country hundreds of billion dollars a year. It has got a lot of harmful effects in our economy. Counterfeiting hurts businesses. They lose the right to profit from their innovation. Counterfeiting hurts workers, because counterfeiting undercuts honest competition, rewards illegal competitors. Counterfeiting hurts our -- counterfeiting hurts consumers, as fake products expose our people to serious health and safety risks. Counterfeiting hurts the government. We lose out on tax revenue. We have to use our resources for law -- of law enforcement to stop counterfeiting. Counterfeiting hurts national security, as terrorist networks use counterfeit sales to sometimes finance their operations.

This administration and Congress have worked together to confront the illegal threat, the real threat of illegal activity such as counterfeiting. And the bill I'm signing today is an important step forward.

The bill helps us defeat counterfeiting in two key ways. First, the bill strengthens our laws against trading counterfeit labels and packaging. In the past, the law prohibited the manufacturing, shipping, and -- or selling of

counterfeit goods, but it did not make it a crime to ship falsified labels or packaging, which counterfeits could then attach to fake products.

This loophole helped counterfeiters cheat consumers by passing off poorly-made items as brand-name goods. By closing the loophole, we're going to keep honest Americans from losing business to scam artists.

Secondly, the bill strengthens penalties for counterfeiters and gives prosecutors new tools to stop those who defraud American consumers. The bill requires courts to order the destruction of all counterfeit products seized as a part of a criminal investigation. The bill requires convicted counterfeiters to turn over their profits, as well as any equipment used in their operations, so it can't be used to cheat our people again. The bill requires those convicted of counterfeiting to reimburse the legitimate businesses they exploited. These common sense reforms will help law enforcement to crack down on this serious crime. We've got to get the counterfeiters and their products off the streets.

The tools in the bill I sign today will become a part of our broad effort to protect the creativity and innovation of our entrepreneurs. This administration is leading an initiative called STOP -- Strategy Targeting Organized Piracy. Nine federal agencies are coming together in this initiative, including the Department of Justice, which has launched the most aggressive effort in American history to prevent intellectual property violations. We've expanded computer hacking and intellectual property units in U.S. Attorney's offices all across the country. We're posting specially trained prosecutors and FBI agents at American embassies in Asia and Eastern Europe. We're working with other nations and the World Trade Organization to promote strong intellectual property laws around the globe. We're cooperating with the private sector to raise awareness of counterfeiting so we can help stop fraud before it starts.

These efforts are getting some results. Last year, we dismantled a piracy ring in Massachusetts that was planning to sell more than 30,000 counterfeit hand bags and shoes and necklaces and other items.

With partners overseas, we broke up a prescription drug counterfeiting network, and seized more than $4 million in phony medicine. With the help of 16 countries on five continents, we removed more than $100 million of illegal online software, games, movies and music. This is a really important effort, and as we call upon folks to send a message to the counterfeiters, we're not going to tolerate your way of life, that we need to give them all the tools necessary to do their jobs. And this bill I'm going to sign here in 30 seconds does just that.

Again, I want to thank you all for being here to help honor these legislators that crossed the partisan divide to help protect this country from those who feel like they can sell illegal products and counterfeit and steal our -- steal intellectual property. Good work. Thanks for coming. Now let's sign the bill. (Applause.)

(The bill is signed.) (Applause.)

END 3:15 P.M. EST

---

**Return to this article at:**
http://www.whitehouse.gov/news/releases/2006/03/20060316-7.html

CLICK HERE TO PRINT

**EXHIBIT H**

**TO**

**AFFIDAVIT OF JACOB S. WHARTON**



WOMBLE
CARLYLE
SANDRIDGE
& RICE

A PROFESSIONAL LIMITED
LIABILITY COMPANY

One West Fourth Street
Winston-Salem, NC 27101

Telephone: (336) 721-3600
Fax: (336) 721-3660
www.wcsr.com

Michael E. Ray
Direct Dial: (336) 721-3648
Direct Fax: 336-733-8312
E-mail: mray@wcsr.com

*--- Confidential ---*

January 15, 2008

The Honorable Michael J. Garcia
United States Attorney – Southern District of New York
One St. Andrews Plaza
New York, New York 10007

Re:   ***Notice of Application Pursuant to 15 U.S.C. § 1116(d)(2)
Counterfeit Apparel – SUPER HOOD® Sweatshirts***

Dear Mr. Garcia:

This firm represents Hanesbrands, Inc. and HBI Branded Apparel Enterprises, LLC (collectively "HBI"), based in Winston-Salem, North Carolina. Please allow this letter to serve as notice under 15 U.S.C. § 1116(d)(2) that HBI intends to seek an order from the United States District Court for the Southern District of New York requesting seizure of counterfeit apparel being sold in New York City.

HBI manufactures and sells, among other apparel, high quality sweatshirts sold under the CHAMPION and SUPER HOOD trademarks. It has come to HBI's attention that multiple retailers in New York City are selling counterfeit CHAMPION SUPER HOOD sweatshirts that closely resemble authentic goods and bear replicas of HBI's federally registered trademarks. HBI expects to file a complaint and motion accompanied by supporting papers within seven business days of the date of this letter seeking, among other relief typical in trademark infringement actions, an *ex parte* order seizing counterfeit goods and related records, an *ex parte* temporary restraining order, and a preliminary injunction. Although HBI's investigation is ongoing, HBI has identified the following businesses, all of which do business in New York City, as trafficking in counterfeit goods and thus will be named as defendants:

- Metro Sports, Inc. (d/b/a Players Sports, d/b/a Hot Dot, d/b/a Hip Hop Sportswear);

- Hot Dot Fashions, Inc.;

- Hip Hop Sportswear, Inc.;

- Michael Fashions, Inc. (d/b/a Michael Fashion);

- London Boy Sportswear Ltd. (d/b/a London Boy);



EXHIBIT

H

tabbies®

WOMBLE
CARLYLE
SANDRIDGE
& RICE
PLLC

- Trandz N.Y., Corp. (d/b/a Octane);

- Octane NYC Inc. (d/b/a Octane);

- Flash Sports, Inc;

- 104th St. Fashions (d/b/a 104 Street Fashion, d/b/a 104 Fashions); and

- F.T.C. Fashion.

In addition, HBI has named various John and Jane Does and unidentified companies as defendants, the identities of which can only be learned through discovery.

    Please contact the undersigned if the United States Attorney's office for the Southern District of New York requires additional information about this matter.


                    Very truly yours,

                    **WOMBLE CARLYLE SANDRIDGE & RICE**
                    *A Professional Limited Liability Company*


                    Michael E. Ray

MER/JSW